Mr. Justice MILLER
delivered the opinion of the court.
The Court of Claims, upon the facts which it found, decided as-conclusions of law—
1. That the government of the Confederate States was an unlawful assemblage without corporate power to take, hold, or convey a valid, title to property, real or personal.
2. That the claimant was 'chargeable with notice of the treasonable intent of the ‘sale by* the Confederate government, aud that the transaction was forbidden.,by the laws of ■the United States, and wholly void, so that the claimant acquired no title to the property which is the subject of suit.
,-Ve do not think it necessary to say anything in regard to the first proposition of law' laid down by that court.Whether the temporary government of the Confederate States had the capacity to take-and hold title to real or personal property, and how far it is to be recognized as having been a de facto government, and if so, what consequences follow in regard to its transactions as they are to be viewed in a court of the United States, it will be time enough for us to decide when such decision becomes necessary. There is no such necessity in the present case.
*462 We rest .our' affirmance of the judgment of the Court of Claims upon its second proposition.
. It is a fact so well, known as to need no finding'of the court, to establish it, a fact which, like many other historical events, all .courts take notice of, that cotton was the principal support of the rebellion, so far. as .pecuniary aid was necessary to its support. The Confederate government early adopted the policy of collecting large quantities <?f cotton under its control, either by exchanging its.bouds for the ‘cotton, or when that failed, by forced contributions. So long as the imperfect blockade of the Southern ports xand the. unguarded condition of the Mexican frontier enabled them to export this cotton, they were.well supplied in return with ai’ms, ammunition, medicine, and the .necessaries of life not grown within their lines, as well as with that other great sinew of war, gold. If the rebel government could freely have exchanged the cotton of which it was enabled to possess itself, for the munitions of war or for gold, it seems very doubtful if it could have been-suppressed. So when the rigor pf the blockade prevented successful export of this cotton, their next resource was to sell it among their own people, or to such persons claiming outwardly to be loyal to the United. States, as would buy of them, for- the money necessary to support the tottering fabric of rebellion which they called a government.
The cotton which is the subject of this controversy was of .this class. It had been in the possession and under the control of the Confederate government, with claim of title. It was captured duriug the last days of the eidstence of that govérnment by our forces, and sold by the officers appointed fpr that purpose, and the money deposited in the treasury. ■
' The claimant now asserts a right to this mouey on the ground that he was the owner-of the cotton when it was so captured. This claim of Tight or ownership he must prove; in the, Court of Claims. .He attempts to dó so by- showing that he purchased it of the Confederate government and paid them for it in money. In doing this he gave aid and-assistance to-the rebellion in the most efficient manner , he *463 possibly could. He could not have aided that cause more acceptably if he had entered its service and become, a blockade-runner, or under the guise of a privateer had preyed upon the unoffending commerce of his.country. It is asking too much of a court of law sitting .under the authority of the government then struggling for existence against a treason respectable only for the numbers and the force by which it was supported, to hold that one of its own citizens, owing and acknowledging to it allegiance, can by the proof of such a transaction establish a title to the property so obtained. The proposition that there is in many cases a public policy which forbids courts of justice to allow any validity to contracts because of their tendency to affect injuriously the highest public interests, and to undermine or destroy the safeguards of the social fabric, is too. well settled to admit of dispute. That any person owing allegiance to an organized government, can-make a contract by which, for the sake of gain, he contributes most substantially and knowingly to the, vital necessities of a treasonable conspiracy against its existence, and then in a court of that government base successfully his 'rights on such a transaction, is opposed to all that we have learned of the invalidity of immoral contracts. A clearer case of turpitude in the consideration of a contract can hardly be imagined unless treason be taken out of the catalogue of crimes.
The case is not relieved of its harsh features by the,finding of the court that the claimant did not intend to aid the rebellion, but only to make money. It might as well be said that the man. who would sell for a sum far beyond its value to a lunatic, a weapon with which he knew the latter' would kill himself, only intended to make money.and did not intend to aid the lunatic in his fatal purpose. This court, in Hanauer v. Dome,* speaking of one'who set up the same defence, says: “ He voluntarily aids treason. He cannot be permitted to stand on the nice metaphysical distinction that, although' he khows that the purchaser biiys the *464 .goods for the purpose of aiding the rebellion, he' does not' sell them for that purpose. The-consequences of his acts' are too serious to admit of such- a plea. He- must bo taken to intend the consequences of his own voluntary act.” This case,-and-the succeeding one of Hamaucr v. Woodruff,* are directly in point in support of our view of the case before us.
' The recognition .of. the existéuce and the validity of'the acts of the- so called Confederate government, am] that of the States which yielded a.temporary support to that government, stand on very different grounds, and aré governed by very different considerations.
The latter, in mos], if not-iñ all, instances, merely transferred the existing State organizations to- the-support óf a new and different national head. The same constitutions,'' the same laws for the protection, of property and personal rights remained, and were administered by the same-officers. These laws, necessary in their recognition and administra-; tion to the- existence of organized society, were the .same, with slight exceptions, whether the authorities, of the State' acknowledged allegiance to the true or the false Federal power. They were the fundamental principles for which civil society is organized into government in all countries, and must be respected in- their administration under whatever temporary dominant authority they ^nay bo exercised. It is only when in the use of 'these powers substantial aid and comfort was given or intended to be given to the rebellion,, when t\ie functions necessarily'reposed in the State for' the maintenance of civil.society, were perverted- to-thq manifest and intentional aid Of 'treason against the government of the. Union, that their acts are void.†
-The government of the Confederate States can'receive ho. aid from this course of reasoning. It had no existence, except as a c.ouspiraey to .overthrow lawful authority. Its foundation was treason against the existing Federal government. Its single purpose, so long as it lasted, was to make that treason successful. So -far from being necessary to the *465 organisation of civil government, or to .its maintenance. and .support, it was inimical to social order,'destructive to the best interests of society, and its primary object was to overthrow the government on which these so'largely depended. Its existence and temporary power were aii enormous evil, which the whole force of the government and the people of the United States was engaged for years-in destroying.
. When, it was .overthrown it perished totally. It left no laws, no statutes, no decrees, n.o authority which' can give support to any contract, or any act.done in its service, Or in aid of its purpose, or which contributed to protract its existence. So far as the actual exercise of its physical power, was brought to bear'upon individuals, that may, under sonie circumstances, constitute a justification- or excuse foi; acts otherwise indefensible, but no validity call -be given in the courts of this country to acts'voluntarily-performed in direct .aid and support of its unlawful purpose.. What of good, or-evil’has flowed from it remains for the consideration and-discussion of the'philosophical statesman and .historian.
Judgment affirmed.

 12 Wallace, 342.

 15 Wallace, 439.

 Texas v. White, 7 Id. 700