## Parks, Brewer & Co. *v.* Coffey.

*Bill for Injunction against Sale under Execution and to prevent Clouds on Title.*

1. *De jure government of State during late war.* — The state government, as organized and existing, in all its departments in Alabama, during the late war, was its rightful *de jure* government.

2. *Same; proceedings of courts of.* — Judgments and proceedings of its courts, which during that time formed a portion of that government, not violative of the Constitution and laws of the United States, or infringing upon the state Constitution, are valid and binding.

[Parks *v.* Coffey.]

3. *Same; validity of sale since war under judgment during war.* — A sale of land under a *pluries* execution, issued since the war on a judgment rendered during the war, is valid, and will pass the title of the defendant in execution; and he not questioning the validity of the process, a third person cannot collaterally attack a sale under the execution, on the ground that *scire facias* was necessary to authorize execution.

4. *Priority of right between purchaser at execution sale and attaching creditor.* — When an *alias fi. fa.* issues, followed up, without the lapse of a term, by a *pluries* execution under which a sale is made, the purchaser's title is superior to the lien of a creditor who attached the land in the interval elapsing between the issue of the *alias fi. fa.* and the sale under the *pluries* execution.

APPEAL from Chancery Court of Jackson.

Heard before Hon. R. L. WATKINS.

The facts are fully stated in the opinion in chief and the response to the application for a rehearing.

WATTS & TROY, for appellant. — 1. From 1865 to 1868, it was conceded by every department of the state government of Alabama that executions issued on judgments rendered during the war were valid. *Foster* v. *Moody*, January term, 1873.

2. The supreme court of the United States has repeatedly held that the transactions of courts and legislatures of the seceded States, in regard to domestic questions, and not violative of the Constitution and laws of the United States, are as binding and valid upon citizens of those states as if there had been no war. *Texas* v. *White*, 7 Wallace, 700. On principle it is difficult to see how it could be otherwise. The authority of no respectable publicists can be found to the contrary.

3. A sale under the execution of appellee would create a cloud on appellant's title which equity will prevent by an injunction. *Martin* v. *Hewitt*, 44 Ala. 459; *Peebles* v. *Mobile & Girard Railroad Co.* 47 Ala. 317.

4. The lien of execution attaching before the creditor's lien arose, and being kept up until the sale, confers rights superior to those of the attaching creditor, accruing in the interval.

JOHN D. BRANDON, *contra.* — Execution issued on a judgment rendered during the war created no lien. *Shaw* v. *Lindsay*, 46 Ala. 290. Such a judgment does not stand on any higher ground than a foreign judgment. *Martin* v. *Hewitt*, 44 Ala. 459. It can be enforced only by the law of comity, and except as evidence such a judgment cannot operate beyond the limits of the country in whose courts it was rendered. Story, Conflict of Laws, § 609.

2. No execution can issue on such judgment, until after a second suit and judgment in the *forum* in which it is sought to be enforced. *Dimick* v. *Brooks*, 21 Vermont, 569; 44 Ala. 419.

3. None of the cases heretofore decided in this court militate

against these views. No lien having been created by the executions under which appellants claim, and appellee's rights having accrued before a sale to them, he has a perfect right to sell, and the court below properly denied the relief prayed by the appellants. None of the decisions of the supreme court of the United States have gone so far as to hold that a different effect will be given to *war judgments* than that accorded by the government within whose jurisdiction they are sought to be enforced.

MANNING, J. — Appellants are in possession of, and purchased the land which is the cause of this suit, in December, 1866, at a sheriff's sale under a *pluries* writ of execution upon a judgment of the circuit court of Jackson county, rendered in 1861, during the late war, against Wallace and Chitty. The land belonged to defendant Chitty. A writ of execution, on which the costs and interest were made, was issued on this judgment in 1862; another was issued June 28th, 1866; and next in order to this, without the lapse of a term, was the *pluries* writ, under which the sale was made.

Appellants claimed the land under another title also. In March, 1866, it was attached by the sheriff of Jackson county by virtue of a writ of attachment in a suit of Falls & Cunningham against Wallace & Chitty, in which judgment was rendered, in 1867, in favor of plaintiffs. And appellants show a sheriff's deed to them, as purchasers of the same land under this judgment also.

The appellee, who was defendant below, had caused this same land to be attached in September, 1866, under a writ of attachment in a suit of his own against said Chitty, and having afterwards obtained a judgment therein, he was pressing a sale of the land under an execution upon that judgment.

The bill in this cause was filed by appellants for an injunction against this proceeding, and to remove the cloud it cast upon their title. And as under the decisions of this court, after the reconstruction of it in 1868, judgments rendered during the war were held incapable of sustaining executions on them, and of creating liens upon property after the war, the struggle of the parties to this cause was, on the part of appellee, to assail the title of appellants under the second judgment, rendered after the war, and on the part of appellants, to maintain that title. It is not necessary, however, to review the evidence relating to this contest (which occupies a large part of the record), if, under the later decisions of this court, and in our opinion, judgments rendered during the war are not for that reason invalid.

[Parks *v.* Coffey.]

For the appellee, it is insisted that, according to the decisions of our immediate predecessors, judgments rendered in the courts of Alabama during the war are to be considered as having no higher authority than the judgments of foreign courts ; of which, as such, execution could not be had in our courts. Such decisions were made, but they were afterwards modified by the same, or some of the same judges who made or concurred in them.

The times, indeed, were not then favorable to the formation of correct opinions. Everything was disestablished. The Confederate government with all its departments, offices, and great powers, had gone down before men's eyes, and was seen no more. The state governments were prostrated, and military administrations were set up in their stead. To these succeeded civil governments that had been solemnly instituted by delegates from the people assembled in conventions. These, also, were overturned and denounced as illegal, by the acts of Congress known as " the reconstruction laws," and others were constituted to take their places.

We are referring to events, not criticising them. It does not come within the scope of our duties on this bench to pass judgment on the conduct or policy of any of the actors in those tragic scenes. But there was a general instability of the most inviolable institutions of society. And in the conflict of passions and interests producing it, principles became indistinct, and the minds of men possessed by lawless and revolutionary ideas.

That a much greater amount of evil than that which we have hitherto suffered did not result from this condition of things, is largely due to the moderation, wisdom, and learning of the supreme court of the United States. The influence of its action has been felt in all the courts of the land. And it is by the light which that tribunal has shed upon the subject, that we propose to proceed in our investigations of the questions : What authority is due to the judgments and decrees of the courts of Alabama rendered during the war ? and What was the *status* of those courts ?

In 1867, the case of *Walker* v. *Villavaso* (6 Wall. 124) came before that court. The facts concerning it were these : In 1861, Louisiana had (according to the report of the case) " passed an ordinance of secession from the Union, adopted the constitution of the rebel states, required all office-holders to swear allegiance to it, and had been proclaimed in a state of insurrection by the President of the United States." After this, in October, 1861, a decree for the foreclosure of a mortgage, and sale of the mortgaged property, was made by a district court of that State. In 1867, after the war was over, this

[Parks v. Coffey.]

decree was affirmed by the supreme court of Louisiana, then reconstituted and a loyal court. In the supreme court at Washington, it was insisted that it must take judicial cognizance of the facts mentioned, which (as it was urged) made the decree of the district court void, as that of an insurrectionary court, under a political organization hostile to the United States, and so must judicially know that the appellate court of Louisiana, in affirming that decree, decided adversely to the proposition, that it was void for that reason; wherefore the supreme court of the United States should take jurisdiction of the cause. But it held in a brief opinion, that this matter not appearing by the record to have been in controversy below, the cause could not be brought before it under the Judiciary Act of 1789, and it was, therefore, dismissed. This left the original decree below (rendered when Louisiana, as one of the Confederate States, was waging war against the federal government) to be carried into effect, upon the recognition and affirmance of it as valid, after the war, by the supreme court of Louisiana.

At the same term (December, 1867) of the supreme court, at Washington, the question came up in a different form, in *White* v. *Cannon*, 5 Wall. 443. This also was from the supreme court of Louisiana. But this time it was that court, and not the inferior one, that was the "rebel court." And it had, after the ordinance of secession of Louisiana had been passed, reversed the judgment of an inferior loyal court, and rendered a different one in its stead. Upon the argument of it at Washington, it was suggested to the court that the decree of the appellate court below was void, because rendered after the secession of Louisiana from the Union. But the supreme court of the United States, after reviewing the case, affirmed the decree, and briefly said in conclusion: "The objection that the decree of the supreme court of Louisiana is to be treated as void because rendered some days after the passage of the ordinance of secession of that State, is not tenable. That ordinance was an absolute nullity, and of itself alone, neither affected the jurisdiction of that court, or its relation to the appellate power of this court."

At the next term came up the great case of *Texas* v. *White*, to which we shall recur hereafter.

In June, 1871, in the circuit court of the United States, at Mobile, Mr. Justice Bradley of the supreme court presiding, the case of *Lockhart et al.* v. *Horn, Ex'r, et al.*, came up for consideration. This was a suit on the equity side of the court, to set aside a will which had been established in a probate court of Alabama, and for the settlement of an administration.

VOL. LII.

In his opinion in the cause, Justice BRADLEY said : " The complainant relies on several grounds for the suspension of the limitation : first, the fact that civil war was raging in Alabama and other States, from January 11, 1861, when the act of secession was adopted, to the close of hostilities and restoration of order, in the summer or fall of 1865.   I do not agree that this was a sufficient ground for the suspension of legal remedies and acts of limitation, as between the citizens of Confederate States, any more than it would be as between citizens of States which adhered to the general government.   It is a fact, that the courts of Alabama were open to all the citizens of the Confederate States, and there was no law to prohibit them from resorting thereto. . . . . Unless a country is actually occupied by hostile forces, and its laws and courts are suppressed, it would be giving to the courts too large a discretion, to allow them to decide when and when not the statutes of limitation are in operation, as between their own citizens."

Having, after reviewing all the grounds, decided that complainants were not excusable for not having brought suit during the war in the courts of Alabama, and were therefore barred of a part of the relief they claimed, the learned justice had next to meet the question of the liability of the executor for funds of the estate which, in 1864, he had invested in bonds of the Confederate States.   In reference to this, he says : " As a general rule, in my judgment, all transactions, judgments, and decrees which took place in conformity with existing laws, in the Confederate States, between the citizens thereof, during the late war, except such as were directly in aid of the rebellion, ought to stand good.   The exception of such transactions as were directly in aid of the rebellion is a political necessity, required by the dignity of the United States government, and by every principle of fidelity to the Constitution and laws of our common country."

Having decided that the investment in Confederate bonds was directly in aid of the rebellion, and that therefore the executor could have no benefit from that act, the final question was, whether the executor should be liable for the funds he had so invested as good money, or for their value at the. time, as Confederate treasury-notes, he having received them in payment, as the currency then in use.   It appeared that the executor took office in March, 1858 ; that the debts from which those funds arose were due before the war began ; and that he was urged and cited to settle the estate in August, 1860, and again in January, 1861 ; and " he has not shown " (says Justice BRADLEY) " sufficient excuse for not collecting the funds of the estate before the war commenced.   Had he shown such

[Parks *v.* Coffey.]

excuse, I should have felt bound to charge him only with the value of the funds at the time when he received them, with a reasonable allowance of time for making a settlement."

"It may be urged" (continued the learned justice) "that the decree of the probate court, made in May, 1864, is conclusive on the question of the executor's diligence. . . . . But a careful examination of that decree shows that this question was not passed upon by the court. . . . . *Had the court* decided the question of diligence, I should have deemed *its decision on that point conclusive.*"

These large extracts are made, because this opinion of Judge Bradley is believed to be not yet published in any book of reports, and because of its great value in showing how fully and emphatically the eminent judges of the highest court in the land acknowledge the validity and authority (when not in conflict with the federal Constitution) of the laws, judicial proceedings, and governmental institutions of the States of the late Southern Confederacy.

In affirming the decree of Justice Bradley, in this case, the supreme court of the United States said: "We admit that the acts of the several States, in their individual capacities, and of their departments of government, executive, judicial, and legislative, during the war, so far as they did not impair or tend to impair the supremacy of the national authority, or the just rights of citizens under the Constitution, are in general to be treated as valid and binding. The existence of a state of insurrection and war did not loosen the bonds of society, or do away with civil government, or the regular administration of the laws. Order was to be preserved, police regulations maintained, crime prosecuted, property protected, contracts enforced, marriages celebrated, estates settled, and the transfer and descent of property regulated, precisely as in time of peace. No one, that we are aware of, seriously questions the validity of judicial or legislative acts in the insurrectionary States, touching these and kindred subjects, where they were not hostile in their purpose or mode of enforcement to the authority of the national government, and did not impair the rights of citizens under the Constitution." *Horn* v. *Lockhart et al.* 17 Wall. 580. In harmony with these declarations of the law is the opinion in *Texas* v. *White* (7 Wall. 700), as explained in *Huntington* v. *Texas*, 16 Wall. 402. Quotations to this point, from these cases, are needless, and would too much extend this opinion.

But while the validity and authority of the acts, judgments, and decrees of the several departments of the state governments, during the war, are so fully and emphatically affirmed, it is nowhere expressly held that those governments were, dur-

[Parks v. Coffey.]

ing that period, the rightful, legitimate governments of these States. On the contrary, in *Texas* v. *White* (*supra*), the chief justice, *arguendo*, says: " The Legislature of Texas, at the time of the repeal, constituted one of the departments of à government established in hostility to the Constitution of the United States. It cannot be regarded, therefore, in the courts of the United States, as a lawful legislature, or its acts as lawful acts. And yet it is an historical fact that the government of Texas, then in full control of the State, was its only actual government; and certainly if Texas had been a separate State, and not one of the United States, the new government having displaced the regular authority, and established itself in the customary seats of power, and in the exercise of the ordinary functions of administration, would have constituted, in the strictest sense of the words, a *de facto* government, and its acts, during its existence as such, would be effectual, and, in almost all respects, valid. And to some extent, this is true of the actual government of Texas, though unlawful and revolutionary as to the United States."

The chief justice then goes on, without intending (as he says) to be full and exact, to speak of the acts of such a government which must be treated as valid, and concludes by saying: " That acts in furtherance or support of rebellion against the United States, or intended to defeat the just rights of citizens, and other acts of like nature, must, in general, be regarded as invalid and void: " which, accompanied by the explanations made in *Huntington* v. *Texas* (*supra*), corresponds with what we have before quoted from *Horn* v. *Lockhart*, 17 Wall. 580.

Of the paragraph above, from the opinion in *Texas* v. *White*, without adverting particularly to its defective logic, two things are to be noted: First, the learned chief justice had previously mentioned, that the governor and secretary of state of Texas, having refused to take an oath of allegiance to the Confederate States, " were summarily ejected from office: " and since he speaks in the passage of " the *new* government having displaced the regular authority," &c., we must infer that he had in mind this government, referred to as established by actual usurpation, when he was speaking of its *status* and authority; and secondly, all those acts which he says " must be regarded as invalid and void," if done by the " actual government of Texas, though unlawful and revolutionary as to the United States," would have been equally " invalid and void," if done by the lawful and regular government, before secession from the United States.

Hence, no support is afforded by that opinion to the proposition, that the government of Alabama (which was not estab-

[Parks *v.* Coffey.]

lished by the expulsion of any person from office, and the introduction of a usurper in his place) *was not* the government *de jure* of this State during the war. Other portions of that opinion enable us to demonstrate that it was.

"We have already" (says the chief justice) "had occasion to remark, at this term, that 'the people of each State compose a State, having its own government and endowed with all the functions essential to separate and independent existence,' and that 'without the States in union, there could be no such political body as the United States." *County of Lane* v. *The State of Oregon*, 7 Wall. 76. Not only, therefore, can there be no loss of separate and independent autonomy to the States, through their union under the Constitution, "but it may be not unreasonably said that the preservation of the States, and the maintenance of their governments, are as much within the design and care of the Constitution, as the preservation of the Union and the maintenance of the national government. The Constitution, in all its provisions, looks to an indestructible Union, composed of indestructible States."

Uttered at a time of stormy excitement, when the obligations and restraints of the Constitution were little heeded, these are noble sentences. Before the war, then, and while in the Union, Alabama was endowed with autonomy. Her people composed "a State having its own government, and endowed with all the functions essential to a separate and independent existence." The persons who exercised this government were elected into it by this people. They were not appointees of any officials of the United States. Their tenure of office did not depend upon any federal functionary. They could not be deposed, or their places supplied, by the action of any one from without the State. In fine, they composed a government, created by the people of Alabama, for the enactment and enforcement of the laws of this people, were responsible for their official acts only to this people, could be succeeded in office only by those whom this people should elect, and possessed, rightfully, *de jure*, all the powers of government, except those which were denied to them by the Constitution of Alabama and the Constitution of the United States.

The rightful government, thus constituted and thus endowed with the powers and faculties of administration, which Alabama had before and when the act of secession was passed, continued without change, except by the regular election or appointment of successors to the persons whose terms of office expired, down to the close of the war. If any of its members ceased to be lawful members of the government, while they acted as such, and became merely *de facto* members of it, or only *actual* members, they were then usurpers of seats of

[Parks *v.* Coffey.]

authority which belonged to others. Who were those others that were thus expelled, or kept out? Who claimed to be so? Who, if the incumbents had vacated their offices, would have had the right, or claimed that they had the right, to take and occupy them?

These are questions that cannot be answered; and why not? Because the incumbents of those offices were not usurpers of them, but rightfully in possession.

Is there some dim idea, however, existing, that although this be true of the persons exercising authority, yet the state government itself, with its departments and offices, had become defunct? How could this happen?

Whether in the Union or out of it, Alabama did not cease to be a State. Some of her elder sisters were States with their separate and independent governments, before the Union under the Constitution was formed; and any or all of them might continue to be so, if the Union were utterly dissolved. To the political community denominated a State, the organization which we call government is essential; it is of the substance of it, and a part of the idea which the word expresses. And such an organization was certainly quite as necessary to Alabama, while dissevered from her co-states, as while in union with them. This is indeed affirmed, or recognized, in most of the passages which we have quoted from cases in the federal courts. The latest of those in the supreme court, at Washington, relating to this matter, is that of *Sprott* v. *United States*, decided at the present term. [See report in the January No. 1875, of The American Law Register.] MILLER, J., in delivering the opinion of the court, and speaking of the difference between " the so-called Confederate government and that of the States," says : " The latter, in most, if not in all instances, merely transferred the existing state organizations to the support of a new and different national head. The same constitutions, the same laws for the protection of property and personal rights, remained and were administered by the same officers. These laws, necessary in their recognition and administration to the existence of organized society, were the same, with slight exceptions, whether the authorities of the State acknowledged allegiance to the true or the false federal power. They were the fundamental principles for which civil society is organized into government, in all countries, and must be respected in their administration under whatever temporary dominant authority they may be exercised."

Anything more conclusive on this point, it would be both difficult and needless to produce. But we may add, that it having been repeatedly held by the highest court of this coun-

[Parks v. Coffey.]

try, that the acts and ordinances of secession were mere nullities, absolutely void, and all the efforts made in support of them having proved ineffectual, it follows that legally, in contemplation of law, Alabama was never out of the Union. The Constitution and laws of the United States, though their operation was suspended, continued obligatory within her borders, during the whole period of the war. And she continued to be a member of what the Constitution in all its provisions designed to be " an indestructible Union, composed of indestructible States."

Of course, we are not to be understood as holding that because the courts and legislatures of Alabama during the war were such rightfully — *de jure* — therefore, whatever they did must be lawful. Admit, for the sake of the argument, that the persons exercising public functions employed them in doing many illegal acts, even treasonable ones. What then ? Concede that they became liable to be, and were, pursued, driven from office, and punished, by the federal government; and that their official acts of the character supposed must be treated as null and void. All this would not prevent the things which they had officially done that were not in violation of superior laws, or of the rights and obligations arising under such laws, from being valid and effectual, any more than the crimes of Charles I. and his decapitation for them, or those of James II., for which England dethroned and expelled him, invalidated the acts which they had lawfully done while they yet actually swayed the sceptre, as kings *de jure* of the realm.

Our conclusion then is, that the courts of Alabama, during the war, were a portion of the rightful government of the State ; and that their judgments, decrees, and proceedings, not in violation of the Constitution and laws of the United States, or of any right or obligation arising under them, and not in violation of the Constitution of Alabama, are valid, and must have operation and effect accordingly.

We have before mentioned that the views of our predecessors on this point, as expressed in *Hall* v. *Hall* (43 Ala. 488), *Powell* v. *Boon* (Ib. 459), *Martin* v. *Hewitt* (44 Ala. 418), and in other cases, have been modified by later decisions. We refer to the cases of *Tarver* v. *Tankersley*, *Powell* v. *Young*, and *Riddle* v. *Hill*, decided at the last (June) term of this court, and the opinions therein delivered by BRICKELL, J.

In them it was held, conformably with the opinion of the supreme court of the United States in *Horn* v. *Lockhart* (*supra*), that " judicial proceedings in this State during the war, so far as they did not impair, or tend to impair, the supremacy of the national authority, or the just rights of citizens under the Constitution, are to be treated as binding."

[Parks v. Coffey.]

This rectification of the judicial opinion of the court gave great satisfaction to the lawyers and people of the State. Its tendency was to prevent litigation from being fomented, and the peace of families from being disturbed. We have gone a step further (we hope with like beneficent consequences), in holding that the courts in which those judicial proceedings were had were a part of the rightful government of the State.

One consequence of this decision is, that no act of the legislature, or ordinance of a convention, is necessary to give validity to the judgments, decrees, and proceedings of those courts.

Another consequence is, that the records and papers of those courts, during the war, are to be preserved with the same care, and certified in the same manner, as those of the courts held since; and like punishments are to be inflicted for the destruction, mutilation, abstraction, or falsification of the records and papers of the one as of the other.

According to our views, the title to the land in controversy, acquired by appellants under a judgment rendered during the war, the executions upon which created a lien commencing at an earlier date than that created by the attachment for appellee, is valid. And the proceedings of the appellee to have the land sold under the judgment in his suit are injurious to appellants, and cast a cloud upon their title.

The decree of the chancellor is reversed, and a decree will be here rendered perpetually enjoining appellee from further proceeding to sell the land in controversy to satisfy his judgment.

Appellee will pay the costs of this suit in this court and in the court below.

BRICKELL, C. J., not sitting.

NOTE BY REPORTER.— At a subsequent day of the term, appellee applied for a rehearing. The argument in support of it did not come into the reporter's hands. The following response was made thereto : —

MANNING, J. — Application is made for a rehearing in this cause, upon a supposed misapprehension by the court of the facts disclosed by the record. And in support of the application it is alleged that it was not averred by the appellants in their bill, or proved, that executions were regularly issued upon the judgment under which the land in controversy was purchased by them, without the lapse of a term.

The judgment in the suit of W. H. Webb & Co. against J. E. Wallace and Dixon Chitty, which is one of those under which appellants purchased the land, was rendered on the 10th day of October, A. D. 1861. Execution was issued on it in

[Parks v. Coffey.]

December, 1862, upon which the sheriff returned that he had "received interest and costs on the within *fi. fa.* April 1st, 1863." An *alias fi. fa.* was issued and delivered to the sheriff June 28, 1866, but not returned by him, and a *pluries fi. fa.* was issued and delivered to the same sheriff October 24, 1866, under which he sold the land, and it was bought by appellants on the first Monday in December, 1866, after having been duly advertised. All this appears by the transcript of the record of the cause, which is made an exhibit to the bill of complaint, as a part of it, and was also put in evidence.

The regularity of the proceedings upon the judgment of Webb & Co. against Wallace and Chitty was never disputed or objected to by either of the latter, and it was the land of one of them (Chitty) which was sold, under the execution, to appellants. If the execution ought not to have been issued without a *scire facias* to revive the judgment, advantage should have been taken of this by the parties, in a direct proceeding. The regularity of the process and proceeding cannot be collaterally assailed by a third person.

Speaking of an authority referred to, in *Stewart* v. *Nichols* (15 Ala. 230), COLLIER, C. J., said: "The court seemed to assimilate the case before it to a *fieri facias* sued out after a year and a day after the rendition of the judgment, which is confessedly not void, but merely voidable by some direct proceeding." And again he said (p. 231) : "In such case the judges held that if the execution issued without a *scire facias* after a year and a day, and the defendant did not interpose to set it aside, it was an implied admission that the judgment was unsatisfied and existed in full force." This removed the presumption of payment, arising from the plaintiffs' not taking out execution within a year and a day. See, also, to same effect, *Sellers & Cook* v. *Hayes*, 17 Ala. 753 ; *Pollard* v. *Cocke*, 19 Ala. 188.

The execution issued upon the judgment of W. H. Webb & Co. v. Wallace and Chitty, on the 28th of June, 1866, preceded by nearly three months the attachment of the land in September, 1866, by appellee, and being followed, without the lapse of a term, by the execution of October, gave to plaintiffs in it priority over the attachment. And it was under this latter execution appellants purchased the land.

It is not, therefore, necessary to examine the voluminous evidence relating to appellants' purchase of the same land under the judgment rendered in the case of Falls & Cunningham v. Wallace & Chitty, commenced by attachment other than that of appellee.          The application for rehearing is denied.

BRICKELL, C. J., not sitting.