# McGuire, *et als.* *v.* Buckley.

*Action against Sureties on Administration Bond for Devastavit committed by Principal.*

1. *Legislative enactments and proceedings in the courts of the State during the war; validity of.*—Legislative enactments, and proceedings in the courts of this State, while it adhered to the Confederate States, for the preservation of order, the protection of property, the enforcement of contracts, and in the general administration of civil government, and not with the purpose of aiding the war then raging between the United States and the Confederate States, are valid and binding in all respects.

2. *Overthrow of the Confederacy; effect of, on States giving allegiance to.*—What was the status of States adhering to the Confederate States, after its overthrow by the United States, and what were the consequences resulting therefrom; whether it left the resisting States subject to the will of the United States, as conquered foreign States would have been, or whether they remained States to be dealt with by the conquering power under the limitations of the Constitution; and what those limitations required in the rehabilitation of the States, are political questions which cannot be determined by the courts of a State, which, together with all of its officers, hold power derivatively, from measures devised by the United States for the re-admission of the States within the Union, acquiesced in by the people of the State, and recognized by the Federal government. The practical question, when such matters are brought before the courts, is, not what the conquering power might or should have done, but what it actually did.

3. *Conquest; effect of, on laws of conquered.*—A conquest of itself, does not

[McGuire et al. v. Buckley.]

overthrow municipal regulations, or civil authority; it only confers authority to do so, and, until this is done, both continue.

4. *Proclamation of Gov. Parsons; effect of.*—When the President of the United States, by proclamation, appointed Gov. Parsons to reorganize the civil government of the State, that officer, representing the conquering power, did not abrogate the prior statutes, vacate all its offices, and create new officers, or make any new rules for the protection of life, liberty, or property; but adopted and enforced its laws as he found them, save such as were rendered inapplicable by the results of the war. He retained, by name, nearly all the minor offices essential to the proper conduct of the government, and convenience of the people—a class to which the general administrator of Mobile belonged—and expressed a desire to fill other offices vacated, specially named, and did not include the county administrator of Mobile; and hence that office, if it be conceded that it is an office, remained undisturbed, and continued under that government as it did before.

5. *Reconstruction acts; effect of.*—The fact that the Parsons provisional government, and the State government succeeding it, were afterwards treated as illegal, and overthrown by Congressional act, could not and did not annul lawful acts done by officers of such government prior to that time ; and the reconstruction acts did not abrogate the existing State government, but declared that it should be provisional only until the State was admitted to representation in Congress.

APPEAL from the Circuit Court of Mobile.

Tried before Hon. HENRY T. TOULMIN.

This was an action brought by the appellee, George W. Buckley, who was a distributee of the estate of W. W. Buckley, deceased, against the appellants, who were sureties on the bond of Wesley W. McGuire, as the general administrator of Mobile county, to recover for an alleged devastavit by said McGuire in the administration of the estate of said Buckley.

The complaint set out the bond, which was approved by George W. Bond, as probate judge of Mobile county, on the 7th day of March, 1864 ; averred that McGuire, after giving the bond, qualified as general administrator under it, and that as such administrator, under and by virtue of letters issued to him by the probate court of Mobile county, on the 21st day of September, 1865, he came into possession of a large amount of property belonging to the estate of William W. Buckley, who died in the summer or fall of 1865 ; that he had wasted and misapplied the assets ; that in obedience to a citation issued by the probate court, in May, 1874, McGuire had appeared and made a settlement of his administration ; that on such settlement a decree was rendered against him, in favor of the plaintiff, for the amount claimed ; that execution against him, issued in this decree, had been returned "no property," and that the bond had been thereby forfeited, and the defendants had become liable for the devastavit committed by McGuire.

The defendants filed four pleas, the first denying that McGuire had failed to faithfully administer all estates which came

into his hands ; averring that at the time of the issuance to him of letters on the estate of Buckley, he had ceased to be general administrator.   The second plea averred that at the time of the execution of the bond sued on, the State of Alabama was one of the Confederate States, and at open war with the United States, denying all its laws and jurisdiction, but governed by the laws of the Confederate States, and the laws of Alabama as one of the Confederate States ; that before the first of July, 1865, the government of the Confederate States, and also the government of the State of Alabama, as organized on the day of executing the bond, was conquered and subdued, and before the time specified, the government of the United States had taken entire dominion over the State of Alabama, and proceeded to establish civil government in the State.   The plea averred that McGuire's office was thereby vacated, and the sureties on his bond discharged from liability for his acts after that time ; that Buckley did not die until September, 1865, and therefore they were not liable for the administration of that estate.

The third plea set up the existence of war at the time of the execution of the bond ; averred that the court of county commissioners, who recommended McGuire for appointment, and the court of probate of Mobile county, in which the bond was filed, were courts of and presided over by officers holding under the said government and State so hostile ; that McGuire and the then judge of the probate court which appointed him, were officers of said hostile government and State, giving allegiance thereto and to the Confederate States ; that McGuire was appointed to fill an office under said hostile government of Alabama, and of the Confederate States ; that thereafter, on the 29th of May, 1865, the hostile governments of Alabama, and of the Confederate States, were overthrown, and the people of said State deprived of civil government and were subjected to military rule by the United States ; that thereafter, on the 21st day of June, 1865, Andrew Johnson, President of the United States and commander-in-chief of its armies and navies, took control and possession of the State of Alabama, and ruled and governed the people thereof by the appointment, by proclamation, of one Lewis E. Parsons as governor, with full and absolute power to govern and control the people of the State, and to establish a government from a portion of the people who were styled loyal citizens of the United States ; that Parsons, by virtue of this appointment, did take control of and govern the people of the State, and by proclamation published on the 20th day of July, 1865, declared what laws should be in force and operation, and appointed numerous

[McGuire et al. v. Buckley.]

persons to various offices, subject to the appointing power; that after the office of McGuire, held by him under his appointment in 1864, had determined, by virtue of the premises, letters of administration on the estate of Buckley were issued to him by one Bond, who at that time claimed to be probate Judge of Mobile county, by virtue of an appointment to that office by Parsons, and of his qualification thereunder in pursuance to the terms of his proclamation; that the letters thus issued by Bond were the only letters ever issued to McGuire on the estate of Buckley. By reason of these facts the plea averred that McGuire did not take the letters as alleged in the complaint by virtue of his appointment in 1864, and denied the liability of the sureties on the bond then given for his acts done by virtue of these letters.

The fourth plea set up the existence of war; the overthrow of the Confederacy; the proclamation of the President declaring the State without civil government, and appointing Parsons provisional governor; the proclamation of Parsons organizing the provisional government; the appointment of Bond, as probate judge, by Parsons; the issuance of the letters on Buckley's estate to McGuire by Bond, while acting under his appointment by Parsons; averred that the provisional government thus established was the only government then existing in the State, and its officers the only persons claiming to be entitled to exercise any authority in the State; that McGuire's office, under his appointment in 1864, had expired and determined before the issuance of of these letters, and denied liability of the sureties on the bond then given, for his administration of Buckley's estate.

The statute of limitations for six years was also pleaded.

A demurrer to these pleas having been sustained by the court, the appellants, by leave, filed five additional pleas. The first of these pleas averred that the decree alleged to have been rendered by the probate court, against McGuire, as administrator of Buckley, was not a final decree, and did not entitle plaintiff to maintain this action. The second plea averred that McGuire was appointed administrator of Buckley on the 21st day of September, 1865, by the probate court of Mobile county; that on the 29th of September, 1865, the constitutional convention then in session, by its ordinance, vacated such grant, and that no assets of the estate of Buckley came into McGuire's hands before such letter were vacated. The third of these pleas set up the removal of McGuire from his office by the constitutional convention of 1868, and the legal appointment and due qualification of one Bromberg as his successor, on the 19th of February, 1869, and averred the right of Bromberg to compel a settlement

of McGuire as such administrator, and failure by Bromberg for more than six years to do so, and pleaded the statute of limitations of six years in bar.

The fourth additional plea set up that McGuire was removed from his office, as general administrator, by ordinance of the Convention, on the 29th day of September, 1865; averred that none of the assets of Buckley's estate came into his hands prior to his removal, but that all the assets with which he was charged in the decree rendered against him in the probate court, came into his hands after his removal as aforesaid, and denied the liability of the sureties on the bond of 1864, for the administration of Buckley's estate.

The fifth additional plea averred that the appointment of McGuire as administrator, by Bond as probate judge, on the 21st September, 1865, was illegal, and without any lawful authority, because at that time Bond had not been appointed by Parsons or any other legal authority.

The plaintiff demurred to first four of these pleas, and the demurrer was sustained.

A replication was filed to the fifth plea, which set up Bond's election to the office of probate judge, in May, 1861, for a term of six years, and his qualification under that election; and averred that, at the time of the issuance of the letters to McGuire, he held his office under and by virtue of his election in 1861.

A rejoinder, which averred the overthrow of the Confederacy and the State government, and that by reason thereof all offices held under either were vacated, was demurred to, and the demurrer sustained.

On the trial, the letters to McGuire, and the transcript of the decree rendered against him in the probate court, were admitted in evidence against the objection and exception of the defendants.

The admission of this evidence, and the sustaining of the demurrer to the pleas, are now assigned as error.

E. S. DARGAN, R. H., R. I. & G. L. SMITH, J. LITTLE SMITH and GAYLORD B. CLARK, for appellants.—The liability of a surety is one of strict limitation, and he stands upon the letter of his bond.—5 Ala. 388 ; 15 Peters.  The bond sued on was given after the ordinance of secession in 1861—after the State had expelled by force every vestige of power and authority of the United States and of the State of Alabama, which existed before the ordinance of secession ; it was given after a bloody war had been commenced and carried on by Alabama, and other States in like position, associated together under an organization called the Confederate States

[McGuire et al. v. Buckley.]

government, and the bond was made payable to, and was taken and approved by, a judge of probate, who derived his power from the rebellious State of Alabama, and who held office under, and acted only under the laws of such hostile State. The bond, and the bond alone, constituted the contract which the securities entered into, and the obligation of it is to be determined by the meaning of all the parties to it. The parties to the bond were McGuire and his sureties on the one part, and on the other, the State, represented by Bond, probate judge, standing as *parens patriæ*, but as the parent of a country which had assumed and held an independent power over its people, and one hostile to the power and authority of the United States, taking care of its own citizens as such, and not as citizens of the United States. The faithful administration contemplated by both parties, was the faithful administration of such estates as might be committed to McGuire by the government which appointed him, so long as he continued to hold the office to which he was appointed *by such authority.* Such was the contract of the sureties.—*Van Epp v. Walsh*, 1 Woods, 606. Did they stipulate or contemplate that they would be bound for his acts when the office was held or claimed by him under a different government, under a different appointment, when in truth the term of the office for which they had bound themselves had completely expired even before the death of Buckley? The term for which they consented to bind themselves was under one government; that government was overthrown, completely extinguished. *Could an office under it, filled by its laws, survive the authority of the government?* In a country acquired by conquest or force of arms, the mere will of the conqueror is sufficient to change the laws.—17 Wen. 387; 1 Cowper, 209; 20 How. 176; 9 Wall. 129; 16 How. 164. The condition of Alabama, at the close of the war, was that of a conquered territory at the mercy of the conquerer. The authorities cited above, conclusively show the right of the conquerer to abolish the government of the conquered. Did he do so in this case? On the 21st June, 1863, Andrew Johnston, as president and commander-in-chief of the armies and navies of the conqueror, issued his proclamation, declaring that the rebellion had deprived the people of the State of Alabama of *all civil government,* and he appointed Lewis E. Parsons governor, clothing him with absolute power to do all *he* thought necessary to be done to restore the State to the control of that *portion* of her people *which were loyal to the United States.* This proclamation did two things. It first declared that Alabama had no civil government,—if she had no civil government she had no law, no officer, and no au-

[McGuire et al. v. Buckley.]

thority to make one. It declared that Parsons was the sole judge of what was necessary to be done. Parsons, on the 20th of July, 1865, issued his proclamation, in which he declared that, pursuant to the power vested in him by the President, he appointed certain persons to certain offices upon certain conditions; and declared his readiness to fill other offices when suitable persons could be found, and the loyal citizens of the State wished the offices filled. This shows conclusively that he who had the power to abolish, had chosen to abolish all the offices which he did not specifically fill, at least till he should see fit to fill them. The general administrator of Mobile county was an officer of the State, made so by statute, a part of the machinery of the civil government which the president declared had ceased to exist in Alabama. Buckley was alive when all this was done, and long before his estate was committed to McGuire, the office of general administrator for Mobile county had ceased to exist, and no liability can be imposed on the sureties, who only contracted to be responsible for his acts as general administrator under his then appointment. As to the authority of Parsons to abolish, and the effect of his proclamation, see *Union Bank v. Commercial Bank*, 22 Wallace.

GIBBONS & PRICE, *contra.*

NOTE BY REPORTER.—Appellee's brief did not come into the reporter's hands.

STONE, J.—In *Parks v. Coffey*, 52 Ala. 32, many of the questions raised by this record are considered, and necessarily decided. In that case we approved the rulings in several of the leading decisions of the Supreme Court of the United States, and, notably, the case of *Sprott v. United States*, 20 Wall. 459. The language which we heartily approve in the opinion in that case, defining as it does the legal effect of our recent civil revolution and its overthrow, is as follows : " The recognition of the existence, and the validity of the acts of the so-called Confederate government, and that of the States which yielded a temporary support to that government, stand on very different grounds, and are governed by very different considerations. The latter, in most, if not in all instances, merely transferred the existing State organizations to the support of a new and different national head. The same constitutions, the same laws for the protection of property and personal rights remained, and were administered by the same officers. These laws, necessary in their recognition and administration to the existence of organized

society, were the same, with slight exceptions, whether the authorities of the State acknowledged allegiance to the true or false Federal power. They were the fundamental principles for which civil society is organized into government in all countries, and must be respected in their administration under whatever temporary dominant authority they may be exercised. It is only when, in the use of these powers, substantial aid and comfort was given, or intended to be given, to the rebellion, when the functions necessarily reposed in the State for the maintenance of civil society were perverted to the manifest and intentional aid of treason against the government of the Union, that their acts are void." We say nothing, in this connection, of the terms, *rebellion* and *treason*, employed in the foregoing extract. Such is the verdict which history pronounces on unsuccessful revolution.

In *Horn v. Lockhart*, 17 Wall. 580, that court had said, " The existence of a state of insurrection and war did not loosen the bonds of society, or do away with civil government, or the regular administration of the laws. Order was to be preserved, police regulations maintained, crime prosecuted, property protected, contracts enforced, marriages celebrated, estates settled, and the transfer and descent of property regulated, precisely as in time of peace."

Speaking of the late war, and its consequences on State officers, and the exercise by them of their accustomed functions, we, in *Parks v. Coffey, supra*, said : " Their tenure of office did not depend upon any Federal functionary. They could not be deposed, or their places supplied, by the action of any one from without the State. In fine, they composed a government, created by the people of Alabama, for the enactment and enforcement of the laws of the people; were responsible for their official acts only to this people; could be succeeded in office only by those whom this people should elect, and possessed, *de jure*, all the powers of government, except those which were denied to them by the constitution of Alabama and the constitution of the United States.

The rightful government, thus constituted and thus endowed with the powers and faculties of administration, which Alabama had before, and when the act of secession was passed, continued without change, except by the regular election or appointment of successors to the persons whose terms of office expired, down to the close of the war. If any of its members ceased to be lawful members of the government, while they acted as such, and became merely *de facto* members of it, or only *actual* members, they were then usurpers of seats of authority which belonged to others. Who were those others that were thus expelled or kept

out?  Who claimed to be so?  Who, if the incumbents had vacated their offices, would have had the right, or claimed that they had the right, to take and occupy them?  These are questions that cannot be answered, and why not?  Because the incumbents of those offices were not usurpers of them, but rightfully in possession."  This was our condition up to the moment of the surrender of the Confederate forces.

In the appointment of a general administrator and guardian for Mobile county; in committing to his care the administration of estates of decedents, and in providing for the safe custody of infants and their estates, the courts exercised functions among the most conservative that are known to civil jurisprudence.  These functions can not be tortured into aid and comfort to the war, which this, with other States, were engaged in with the government of the United States.

It is contended, however, that when the Confederate revolution was overthrown, we lost our corporate existence and municipal organization, and were remitted to the common States of conquered territory.  The last of these propositions may admit of serious debate.  It may be, that in the language of Justice Miller, *supra,* we only sought "to transfer our existing State organization to the support of a new and different national head."  It is difficult to understand how such attempted transfer could work a forfeiture of our corporate existence, and resolve us into unorganized elements.  We had never ceased to be a State, and the results of the war proved we had never ceased to be a State in the Union.  But even if our defeat placed us in the category of conquered alien territory, the result contended for did not follow.  Conquest does not *ipso facto* supplant civil administration.  It only arms the victor with the power to displace the precedent authority and to impose one of its own.  It may tolerate and continue existing order—it may modify it—it may impose an entirely new system.  Might makes right; but victory gives only a power to change.  It does not effect the change, *proprio vigore.*  "When the United States take possession of any rebel district, they acquire no new title, but merely vindicate that which previously existed, and are to do only what is necessary for that purpose."—Case of Amy Warwick, Law Rep. June, 1862.  See, also, *Cross v. Harrison,* 16 How. 164.

Conquest of a foreign territory absolves political allegiance, and establishes new political relations.  But, " The reasons for considering the former political laws as abrogated do not apply to the municipal laws, which regulate the private relations of individuals to each other, and their private

rights of property. The change of sovereignty does not obliterate the subject matters of property or obligations, nor the parties to the rights, duties, or compacts; and, in respect to these things, there is a permanent necessity for an uninterrupted existence of laws of some kind. Accordingly, it is held that the municipal private code remains in force. Yet, it is not *proprio vigore*, or by the will of the people of the conquered country, but by the acquiescence of the new sovereignty, which is held to intend the continuance of such laws, in the absence of new laws displacing them."—Wheat. International Law by Dana, 4th Ed. § 346, note 4. Further on in the same note, the same author says, "the private laws of the former State subsist, unless they are suspended by the occupying power, and for the reason that some laws must exist, to regulate private rights and relations, and the persons and things, which are their subjects, remain unchanged: therefore, the laws are permitted to continue, until a change is expressly made."

We think it results from the principles stated above, that if the defeat of the Confederate arms had the same effect on the resisting States, as if they had been conquered foreign States, the consequences were: First, that it broke down and destroyed the attempt to establish a separate Southern Confederacy, and removed all obstacles to the maintenance of the authority of the Government of the United States, within those States: Second, that it clothed the government of the United States with the power to exert its supremacy and will, within constitutional limits, in the matter of rehabilitating such States; and that, in the exercise of this function, the conquering power could impose an entirely new municipal government upon the vanquished, or could leave them under their former municipal organization, either with or without modification: Third, that until a new system was imposed, or the old one modified, the former municipal regulations remained of force; and they were only supplanted to the extent that new laws and new regulations were established. We have supposed this civil status to have been ours, not for the purpose of conceding its truth. It is alike foreign to our intention, and to the wants of this case, to discuss that question. The restoration of the States that had been resisting, to their places in the Union, renders all discussion of the methods by which it was accomplished an immaterial legal inquiry. Power imposed the conditions; the vanquished had no option but to accept; they did accept the terms; and the present political status is the accomplished result. Political status is more a fact than a theory; and in our complex system of government, it depends on the

[McGuire et al. v. Buckley.]

fact of recognition, rather than the constitutionality of the methods by which it is brought about. It is a purely political question, and can never be carried before a court of *oyer and terminer*. If we could succeed in declaring unconstitutional and void, the steps by which we were recognized as States in the Union, the result would be to declare that Alabama is without civil officers; for all the officers of the State hold their commissions derivatively from the reconstruction measures devised by the government of the United States.

But the question for our solution is, not what the conquering power might, or should have done. What did it do?

On the 21st of June, 1865, the president of the United States issued his proclamation, appointing Lewis E. Parsons provisional governor of the State of Alabama, and empowered and instructed him to reorganize the civil government of the State, assuming as a reason for it, that "the rebellion which has been waged by a portion of the people of the United States against the properly constituted authorities of the government thereof, in the most violent and revolting form, but whose organized and armed forces have now been almost entirely overcome, has, in its revolutionary progress, deprived the people of the State of Alabama of all civil government." Broad as this language appears, it was not intended to affirm that the State of Alabama was in a state of anarchy, without any rules of civil conduct. It was not intended to declare that all statutes were repealed, and all offices thereby vacated. The utmost it intended to assert was, that the State of Alabama, in its municipal organization, was at the mercy of the conquering Federal government, and that he, the executive head, had the power to ordain new municipal regulations, and intended to exercise it. And such was the construction placed upon it by Governor Parsons. In his proclamation dated July 20th, 1865, he made known that he came not to tear down, but to build up; not to wound, but to heal. He did not declare all statutes abrogated, or all offices vacated. He proclaimed no new laws, and created no new offices. He made known no new rules for the protection of life, liberty, or property, and introduced no new official machinery for the preservation of these inalienable rights. He proposed to adopt and enforce the laws as he found them, save such as the results of the war had rendered inapplicable, and to retain the machinery which those laws had provided for their enforcement. And while he evidently asserted the right to declare offices vacated, he exercised that right sparingly. He retained in office, by name, justices of the peace, constables, members of the commissioners court (except judges of probate), the county treas-

urers, tax-collectors and assessors, coroners, and municipal officers of incorporated cities and towns, who were in office on 22d May, 1865. And judges of probate and sheriffs, who were in office at that time, were retained in their respective offices, until others were appointed.

It is contended, however, that the general administrator and guardian of Mobile county was, under the statute of his creation, an officer ; and, inasmuch as he is not named in the proclamation as one of the officers retained, this omission to name him vacated his office. We might concede that his is a *quasi* office, but it has none of the attributes of a municipal office. But suppose we concede it is an office. Governor Parsons, representing the conquering power, did not lay his hand upon it, or take any steps to vacate it. We have shown above that conquest does not *per se* overthrow municipal regulations, or civil authority. It only confers the power to do so. This particular office, or trust, was not interfered with, and therefore it continued. But we think the proclamation proves that Governor Parsons, if the subject occurred to him (of which we have doubts), intended to retain this officer, or fide-commissary, in the place in which he found him. We have shown above that he retained all the minor officers, whose services are brought into most frequent requisition. The well-being of society imperatively demanded this. Without these, order could not be preserved, marriages solemnized, or estates administered. Other offices of higher grade, were of less pressing use. These he expressed a willingness to fill, "if the loyal citizens of the State find it necessary to have them appointed." He names these officers—clerks of the Circuit Courts, solicitors, judges of the Circuit Courts, chancellors, and judges of the Supreme Court. It will thus be seen that Governor Parsons provided for and mentioned all the officers constituted and required in municipal administration. The most numerous classes—those whose services were and are most frequently required—he retained in office. Those, whose offices he concluded might be dispensed with for a time—possibly during his provisional administration—he expressed his readiness to fill, "if the loyal citizens of the State [should] find it necessary to have them appointed." We think Governor Parsons, in these named classes, intended to embrace all the officers of the State employed in municipal administration, and that he thought he had done so. We think, further, that he intended to continue, as he found them, the laws and the agents for their administration, to the end that all the rights of person, property, successions, personal relations, and police, as the same are enjoyed under our free constitutions, might not be

interrupted or impaired. And, finally, we think, that when he announced his intention not then to appoint clerks of Circuit Courts, solicitors, judges of circuits, chancellors, and judges of the Supreme Court, his conclusion was that he had continued in operation all other official machinery, for the complete, harmonious administration of municipal government. Under these rules, neither the overthrow of the Confederacy, Governor Parsons' accession to power, nor any official action taken by him, disturbed the incumbency of the office of general administrator and guardian for Mobile county.

If it be contended that all the foregoing was done under the president's proclamation of 1865, and that the State governments thereby sought to be rehabilitated, were treated as illegal and overthrown by the congressional reconstruction of 1867, the answer is, first, that this did not, and could not annul what was done, permissively, if you please, in 1865, under the sanction or acquiescence of the provisional governor ; second, the reconstruction act, itself, did not abrogate the State governments, or their machinery then in exercise, but only declared "that, until the people of said rebel States shall be by law admitted to representation in the congress of the United States, any civil government which may exist therein shall be deemed provisional only."

Much contrariety of opinion may be entertained and expressed by publicists as to the regularity of each of the plans of reconstruction through which we have passed. It is neither our purpose nor province to enter upon the discussion. It is a political question which cannot come before us. The result of the first, temporarily, and of the last up to the present time, has been, in each case, an accomplished fact. We must deal with it as it was and is, not as we may believe it should have been.—See *Plowman v. Thornton*, 52 Ala. 559, 556.

We find no error in the record, and the judgment of the Circuit Court is affirmed.

MANNING, J., not sitting.