BiohakdsoN, J.,
delivered the opinion of the court:
Of all.the products of the States engaged in the rebellion there was none upon Avhich so much reliance was confidently placed as affording the means of obtaining money at home and abroad for carrying on hostile operations against' the national government by land and by sea as cotton, the great staple of the States foremost in the secession movement. (Mrs. Alexander’s Case, 2 Wall., 419, 420; Padelford’s Case 9 Wall., 540; Haycraft’s Case, 22 Wall., 81; Walker’s Case, 120. Cls. R., 408; Young’s or Collie’s Case, 12 C. Cls. R., 679, affirmed on appeal 97 U. S.; Diplomatic Correspondence, 1863, Part I, pp. 15, 71-73.)
The provisional congress of the Confederate States, as early as February 28, 1861, placed an export duty of one-eighth of one per cent, on cotton, and pledged the same for the payment of bonds issued under authority of the act of that date, chapter 21, section 5. (C. S. Stat. L., Prov. Cong., 42.)
On the 21st of April, 1862, the first Confederate congress passed an act (chap. 61, § 3) authorizing the secretary of the treasury to accept for the use of the government, in exchange for bonds, cotton, tobacco, and other agricultural products in kind, to deposit the same at such places as he should deem proper, and to procure advances thereon by hypothecation, or to ship the same abroad, of to sell the same at home or abroad, as he might deem best; and to assist these operations he was farther authorized to issue produce certificates, which should entitle the party to whom issued, or his indorsee, to receive the produce therein set forth, and to ship the same to any neutral port in conformity with the laws of the Confederate States. (Con. States Stat. L., 1st Cong., 47.)
On the 23d of March, 1863, the same congress passed another act (chap. 9, § 8) authorizing the secretary of the treasury to issue and sell coupon bonds, the coupons of which were to be paid at the pleasure of the owner, either in currency or in cot *187 ton certificates, which pledged the government to pay the same in cotton of the quality of New Orleans middlings at the rate of eight pence sterling per pound, and to be delivered at any time within six months after the ratification of a treaty of peace between the Confederate States and the United States, at any or all of the ports of New Orleans, Mobile, Savannah, Charleston, or Wilmington, as the secretary should direct. (C. S. Stat. L., 1st Cong., 3d sess., 101.)
Agents were appointed by the rebel secretary of the treasury to sell bonds and purchase those products of the country named in the acts of Congress, but their principal operations were confined to the exchange of bonds for cotton. Through one of those agents the present claimant sold to the Confederate States the cotton which is now the subject of this suit, and gave a bill of sale thereof in the usual printed form prescribed by authority, in which payment was acknowledged as having been made in bonds, and the vendor agreed to take due care of the cotton while on her plantation, and to deliver it at her own expense at Crawfordsville Station, in the State of Mississippi, to the order of the secretary of the treasury, or his agents or assigns.
Although the property remained on the claimant’s plantation, and had never been taken actual posesssion of by the Confederate Government, the title thereto and the right of possession had passed from the claimant. The cotton had been contributed to the cause of the rebellion, and by the law of nations the United States, in their struggle with the public enemies, had a right to seize and hold it for their own use; and the vendor could not set up the unlawfulness of the rebel government to avoid her own unlawful act in dedicating her property through that organization to be used against the legally-constituted national authority. When the rebellion was suppressed and the power of the Confederate Government was destroyed, all such property, whenever and wherever found, became vested in the United States by right of conquest, and not as successors to the Confederate States in the sense of acknowledging or admitting that organization as having sufficient legal existence to transmit property by succession to any government or power whatever. Such is the well-established'and universally-recognized law of nations. (Sprott’s Case, 8 C. Cls. R., 499, affirmed on appeal, 20 Wall., 459; BleioeWs Gase and cases *188 there cited, 10 C. Cls. R., 240, affirmed on appeal, 13 C. Cls. R., 556.)
The position taken by the Government of the United States was early stated by the Secretary of the Treasury in a letter to one of his special agents appointed to collect such property, dated January 23,1800, in which he says:
“ In the view of the matter taken by the department, it is held that the act of a person in selling or subscribing property to the insurgent organization is a dedication of it to the phr-poses of the rebellion, to be used in subverting and overthrowing the lawfully-constituted government, whereby it is forfeited thereto and the title lost to the person so selling or subscribing ; and it is not considered that any subsequent payment of money in satisfaction of such a subscription of property will re.move the taint of forfeiture so attaching. The property itself is offending, and should be taken wherever -found.
“The United States does not base its claim to such property as the assignee or successor in law of the so-styled Confederate States Government. In fact, this government denies that that organization, as a government or body corporate, could lawfully acquire, possess, or convey any description of property. As an established government, the United States, under the law of nations and the acts of Congress, has the right to seize and apply to its benefit all property which was used to subvert its authority or which has been voluntarily contributed or dedicated to such use or purpose by the owner.” (Acts, Bules, &c., concerning Commercial Intercourse, Treasury Department, edition of 1872, p. 153.)
With these views, the Secretary of the Treasury appointed special agents “to receive and collect cotton purchased by and held on account of the so-called Confederate States Government by one of whom the cotton the proceeds of which are now claimed in this action was seized for the United States. Much property of the same character also fell into the hands of agents who obtained possession of property under the ffon-intercourse Act, July 13, 1861 (12 Stat. L., 257), and under the Captured and Abandoned Property Act, March 12,1863 (12 Stat. L., 820). To these agents the military authorities in the different localities in which they found rebel cotton agencies, when the armies advanced into the enemy’s territory, turned over the captured books, records, bills of sale, and other papers found there relating to purchase and sale of cotton and other property by the insurgent government. When those agents had finished their duties they returned all such papers to the Treasury Depart *189 ment. Tbe bills of sale given to tbe rebel purchasing agents were in duplicate, one copy being retained by them and tbe other sent to the Confederate secretary of the treasury at Bich-mond. On the evacuation of that capital by the Confederate forces and executive government, April 3,1865, the fugitive rebel officers attempted to carry away the most valuable and important archives; but, with the exception of some which were lost, burned, or otherwise destroyed, they were captured by the Union forces and forwarded to the War Department at Washington. Those which related to the purchase and sale of cotton were subsequently transferred to the Treasury Department, and constitute part of the Confederate archives in that department. Among those papers was the bill of sale given by the claimant, of which a copy is set forth in the finding.
That bill of sale is a complete defense to the claimant’s action, and the petition must be dismissed.
Injustice to the claimant’s counsel we may add that, his client being a very aged woman, residing in a distant part of the country, he had no direct communication with her, and was not aware of the sale of the cotton by her to the Confederate States until the bill of sale was produced by the Assisttant Attorney-General late in the progress of the case.