## HUNTINGTON *v.* TEXAS.

## TEXAS *v.* HUNTINGTON.

1. Statement of the points adjudged in *Texas* v. *White & Chiles* (7 Wallace, 700), and *Texas* v. *Hardenberg* (10 Id. 68).

2. The State of Texas provided in an act of December 16th, 1851, authorizing the comptroller of public accounts to receive five thousand bonds, issued, of $1000 each, to the State by the United States, and payable to bearer, that "*no bond issued as aforesaid . . . payable to bearer, shall be available in the hands of any holder until the same shall have been indorsed . . . by the governor of the State of Texas.*" The legislature of the State, when in rebellion, by an act of January 11th, 1862, repealed this act of December 16th, 1851. *Held,* that notwithstanding what may have been said in *Texas* v. *White & Chiles*, and in *Texas* v. *Hardenberg,* the repealing act was valid as to bonds issued and used for a lawful purpose, and that the title of the State to such bonds, without indorsement, passed to the holder unaffected by any claim of the State.

3. No presumption can arise from the absence of such indorsement on the bonds that they had been issued without authority, and for an unlawful purpose, and the presumption that they had been issued with authority and for a lawful purpose is in favor of the holders of the bonds, especially after payment by the United States.

4. It was primarily the duty of the government, as the United States were the obligors in the bonds, and the rebellion was waged against them, to ascertain and decide whether bonds presented to and paid by it had or had not been issued and used in aid of the rebellion; and after such decision the presumption must be that the parties who held the bonds were entitled to payment as against the reconstructed State of Texas.

5. Whether an alienation of the bonds by the usurping government divested the title of the State, depends on other circumstances than the quality of the government. If the object and purpose of it were just in themselves and laudable, the alienation was valid; but if, on the contrary, the object and purpose were to break up the Union and overthrow the constitutional government of the Union, the alienation was invalid.

6. No other than a holder of the bonds, or one who, having held them, has received the proceeds with notice of the illegal transfer for an illegal purpose, can be held liable to the claim of the reconstructed State. After presentment, recognition, and order of payment, any one never having held or controlled the bonds, may receive the proceeds on a proper order.

Error to the Supreme Court of the District of Columbia; the case being thus:

The United States, on the 1st of January, 1851, issued to the State of· Texas for the sale of a portion of her northwestern territory, five thousand coupon bonds of $1000 each, numbered successively from No. 1 to No. 5000, and "redeemable after the 31st day of December, 1864." They were made on ·their face all payable " to bearer," and declared to be transferable on delivery. The coupons, which extended to December 31st, 1864, and no farther, were equally payable "to bearer." These bonds were known as Texas indemnity bonds.

On the 16th of December, 1851, in anticipation of the bonds being delivered to it, the State of Texas passed an act, authorizing their governor to receive them from the United States,

" And when received, to deposit them in the treasury of the State of Texas, *to be disposed of as may be provided by law; provided,* that no bond issued as aforesaid, as a portion of the said $5,000,000 of stock, payable to bearer, shall be available in the hands of any holders *until the same shall have been indorsed in the city of Austin, by the governor of the State of Texas.*"

After this act of December 16th, 1851, and between that· day and the 11th of February, 1860, the State of Texas passed thirteen different acts providing for the sale or disposal·of these same bonds; for lawful State purposes; as *ex gr.*, paying the public debt of the State; the erection of a State capitol; to establish a system of schools, &c., &c.; none of *these* acts requiring in terms an indorsement of the bonds by the governor, as required in the above-quoted act of December 16th, 1851, nor any of them designating by num-

bers on them the particular bonds to be appropriated to the particular objects authorized. Subsequently to this again, the rebellion having broken out, and the State having gone over to the rebel side, and there being a large number of these bonds still undisposed of in the State treasury, the legislature of Texas, by an act of January 11th, 1862, repealed the act of December 16th, 1851 (making an indorsement necessary), and the then authorities of Texas, in January, 1865, sold or transferred certain of the bonds to two persons, White and Chiles, *for the purpose of aiding the rebellion.* In the cases of *Texas* v. *White & Chiles,** and *Texas* v. *Hardenberg,†* in this court, it was determined that as against the true, that is to say, the loyal State of Texas (citizens of which had stopped payment of them at the Federal treasury), no title had passed to bonds which had been thus transferred; and that notwithstanding the transfer, the reconstructed State might reclaim the bonds or their proceeds.

How many bonds were transferred to White and Chiles, or what were their exact numbers, was not perfectly ascertained; but it was well known that the bonds transferred to White and Chiles did not comprise the whole issue for $5,000,000, and that some of them had been transferred under one of the thirteen enactments already mentioned.‡

In this state of things the State of Texas brought suit in the court below against one Huntington, cashier of the First National Bank of Washington, for the alleged conversion of thirty-seven of the five thousand bonds, originally issued to the State.

Of these thirty-seven bonds, ten had been held by one Haas, and were presented and filed at the Treasury Department in July, 1865, by him. After payment of them had been officially recommended by the first comptroller of the treasury, Huntington, at the request of Haas and his attorney, Mr. F. P. Stanton, advanced to them the money on the warrant expected to be issued. Haas accordingly, by letter, dated

---

* 7 Wallace, 700.                    † 10 Id. 68.

‡ See Report of Mr. Comptroller Taylor, submitted to Mr. Secretary McCulloch, August 15th, 1865.

September, 1866, addressed through his attorney to the Secretary of the Treasury, requested that payment should be made to Huntington; and a few days afterwards, that is to say in September, 1866, payment was so made.

As to thirteen others, they were presented and filed in October, 1865, by Huntington himself, and paid to him on the 25th of January, 1866.

The remaining fourteen had like the ten been held by Haas, and were presented and filed by him, and after payment of them had been officially recommended, &c., as in the case of the ten, Huntington, at the request of Haas and his attorney, advanced to them the money on the warrant expected to be issued, and Haas by letter, dated January 1st, 1866, addressed through his attorney to the Secretary of the Treasury, requested that payment should be made to Huntington, who, in regard to these fourteen also, had advanced the money to be paid on them. A few days afterwards payment of these fourteen was so made.

The reader will thus understand that thirteen bonds were presented by and paid to Huntington himself, while the remaining twenty-four had never come in any way into his hands; his only relation to them whatever having been that after the presentation of them by others and the official recommendation of payment of them, he had advanced the amount of the warrant expected to be issued, to the former holders of the bonds, now surrendered to the treasury, and taken from them a request to the Secretary of the Treasury that the amounts due should be paid to *him*.

When the first ten (of Haas's) bonds were paid, the claim of the State of Texas in relation to bonds said to have been illegally transferred, in January, 1865, to White and Chiles, had not been made known to the Treasury Department; but the fact that the State had a claim in relation to such bonds had been communicated to Huntington before the 25th of January, 1866, the date of the payment of the thirteen bonds which he had himself presented and received payment of. Huntington then stated that he had bought the bonds in October, 1865, before hearing of that claim, and

on the faith of the payment in September of the bonds presented in the name of Haas by Mr. Stanton.

In the absence of knowledge whether or not the bonds presented by Huntington were affected by the claim of the State referred to, the comptroller recommended their payment.

It also appeared—or at least the defendant's evidence tended to show this—that before purchasing the thirteen bonds presented for payment in October, 1865, Huntington made inquiries at the Treasury Department for the purpose of ascertaining whether it had any objection to the payment of them; that he was informed by the officers to whom he applied of no objection to their payment, and that they thought they would have to be paid; and that he accordingly purchased them at 96 cents in gold.

It appeared that during the rebellion the Secretary of the Treasury had decided not to pay the coupons of Texas indemnity bonds, except where the bonds were indorsed by some loyal governor of the State. When the rebellion terminated, the question as to the payment of these bonds, as they reappeared, became so urgent that it was taken into consideration by the First Comptroller of the Treasury at the request of the Secretary of the Treasury; and, on August 15th, 1865, that officer furnished the secretary with an elaborate opinion, recommending the payment of unindorsed bonds to holders who received them in good faith. In accordance with this opinion the department commenced the redemption of these bonds, and payments were made as rapidly as the cases which had accumulated could be examined. After notice reached the department of the discovery of the White & Chiles transactions, there was a temporary suspension of the redemption of bonds, which it was suggested might have passed through their hands. The department made efforts to ascertain the numbers of the bonds involved in that transaction, and all practicable endeavors to protect any interest which the State of Texas might have in the premises; and after finding it impossible to determine the numbers and description of the bonds involved in that

transaction, the department proceeded as before with the redemption of indemnity bonds, under the opinion of the comptroller of August, 1865; the comptroller, in each particular case, examining the bonds and recommending their payment. Huntington made occasional inquiries at the department with reference to the indemnity bonds, and was informed from time to time as to the condition of the question there. He was informed of the determination of the department to delay the redemption of bonds long enough to ascertain whether it was possible to do anything to protect the interests of the State of Texas in the bonds issued to White & Chiles, and subsequently that it was impossible for the department to give any information relative to the numbers and description of the White & Chiles bonds.

In compliance with a request of the plaintiffs, the court below instructed the jury that the government of Texas, from August, 1861, to July, 1865, was a usurping government, incapable of performing any act which could legally divest the title to property of the State, and that if the jury should find that the bonds in question were alienated by that government or its agents, that such alienation passed no title; also, that the defendants could acquire no title to the bonds without the indorsement of them by a governor of Texas loyal to the United States; also, that if the defendants took the bonds after maturity, they took them subject to the right of property in them of the State of Texas; and finally, that if the bonds were transferred after maturity by persons exercising authority in Texas and at war with the United States, then no matter how or from whom received by the defendants, they were still the property of the plaintiff, and that the act of defendants in procuring payment of them from the United States Treasury, if that was done, was a conversion, and made the defendants liable for their value with interest.

And in compliance with a request of the defendants, the court instructed the jury, in effect, that if the bonds were presented to the Treasury Department by holders other than the defendants, and payment was ordered, and afterwards

by the then holders the proceeds were directed to be paid to the defendants and were received by them without ever having had possession or control of the bonds, or having claimed title to them, such receipt of the proceeds did not amount to a conversion by the defendants.

The defendants excepted to the first instruction (their exception being a tenth exception taken by them), and the plaintiff excepted to the second instruction.

In accordance with the first of the above instructions, the jury found for the plaintiffs the value of the thirteen bonds, paid on the 25th of January, 1866, and in accordance with the second for the defendants as to the other twenty-four.

The case was now here on the cross-exceptions.

*Messrs. J. Hubley Ashton and W. S. Cox, for Huntington, cashier of the bank:*

1. *As to the tenth (the defendant's) exception.* These bonds were negotiable, and by the decisions of this court are to be put on the footing of negotiable paper.* The title, therefore, is not affected by anything short of actual notice. They are presumed, also, to have been received before maturity;† and even if proved to have been taken by their last holders when overdue, these may protect themselves under one who took it before maturity,‡ and protect themselves, even though they had *notice* of an infirmity in the title, if they derive their title to the instrument from a prior *bonâ fide* holder for value.§

2. Now, although the defendants purchased the bonds which they deposited for redemption, after they were redeemable, there is no evidence that the party from whom they purchased had not received them before maturity. The presumption is the other way; and defendants, standing in their place, are to all legal intents, *primâ facie* the holders before maturity, in good faith, and for a valuable consideration, of these negotiable securities.

---

* Murray *v.* Lardner, 2 Wallace, 110.
† Byles on Bills, 165; 2 Parsons on Bills, 9.    ‡ Story on Notes, § 191.
§ Dudley *v.* Littlefeld, 8 Shepley, 418; Smith *v.* Hiscock, 14 Maine, 451.

3. We are met with the objection, however, that by the act of the legislature of Texas, of December 16th, 1851, the bonds ceased to be negotiable unless they were indorsed by the governor of the State, and that this court has held in *Texas* v. *White & Chiles*, and *Texas* v. *Hardenberg*, that the act of the rebel legislature of January 11th, 1862, repealing the act of December 16th, 1851, is wholly void. To this we reply, that as far as this act of January 11th, 1862, was *in aid of the rebellion*, it has been declared by this court to be void. But, it is submitted, that with *this* exception only, it was valid; and it fully authorized a transfer of the bonds unindorsed, if issued for any lawful and innocent object.

It appears from various acts of the legislature of Texas, thirteen in number, passed from January 31st, 1852, to February 11th, 1860, that the State had authorized the sale or disposal of quantities of these bonds, exceeding in the aggregate, in fact, the whole $5,000,000 in the treasury of the State. For all the objects and uses contemplated by this series of acts passed prior to the rebellion, and, therefore, of unquestionable validity, the repeal of the act of December 16th, 1851, was not a nullity; and bonds issued and put into circulation under these acts, were negotiable and available in the hands of holders, without the indorsement of the governor. A large amount of the bonds may have passed from the treasury of Texas into circulation under these acts, long before their maturity, without the governor's indorsement, and the title of the holders of such bonds would unquestionably be good. If any of the bonds remained in the treasury of the State, whether to the general account, or to special accounts, they may thus have been lawfully put into circulation, unindorsed, long before the *White & Chiles* transaction.

Thus, the purchaser of bonds would see that by a series of laws, covering the whole amount of these bonds, they might have been lawfully put into circulation before maturity, without the governor's indorsement. As these several laws did not designate any particular bonds, any of them might have been issued under any of the laws, without

regard to these particular numbers. The purchaser would discover that, under any one of more than a dozen different laws enacted prior to the rebellion, the bonds offered to him might have lawfully issued before maturity. He would, therefore, buy bonds of the United States expressed on their face to be transferable by delivery without notice of anything affecting the negotiability of the particular bonds.

This series of enactments was not brought to view in the arguments in *Texas* v. *White & Chiles*, or *Texas* v. *Hardenberg*, and was not, therefore, considered by the court.

*The instruction excepted to by the plaintiff.* This related to the bonds that were not owned or controlled by the defendants. As to these bonds, the facts show no case of conversion. The defendants never had possession, use, or control of them. They simply took an assignment of the debt of the United States for the bonds, after they had been delivered up to the government by the holder.

*Messrs. R. T. Merrick and T. J. Durant, for the State, contra,* relied upon the cases of *Texas* v. *White & Chiles*, and *Texas* v. *Hardenberg,* as deciding all the questions in this case as to the bonds purchased by the bank. They contended that, under those decisions, Texas indemnity bonds, in the condition of the present ones, unindorsed, and taken after maturity, could not be validly transferred, so as to convey title, even to an innocent purchaser for value.

Upon the question as to the conversion of the bonds never owned by the bank, they cited *McCombie* v. *Davis,*[*] and *Snow* v. *Leathem.*[†]

The CHIEF JUSTICE delivered the opinion of the court.

We have held in *Texas* v. *White & Chiles,*[‡] and *Texas* v. *Hardenberg,*[§]

1. That when a State by public statute requires the indorsement of its governor as a prerequisite to the valid transfer of bonds belonging to it, and payable to itself or

---

[*] 6 East, 538.                    [†] 2 Carrington & Payne, 314.
[‡] 7 Wallace, 700.                 [§] 10 Id. 68.

bearer, the holder of such bonds, without such indorsement, will have no title as against the State, unless he can show the consent of the State otherwise given to the transfer.

2. That an act repealing the statute requiring the indorsement of the governor, passed by the legislature when the State is in rebellion against the United States, is a nullity as to bonds issued without such indorsement, and for the purpose of aiding the rebellion.

3. That such bonds remain the property of the State and may be reclaimed, or the proceeds thereof recovered in a proper action by that State when the rebellion has ceased, against any one in possession of the same, with notice of the intent with which they were issued and used.

4. That the existence of the rebellion at the time of the repealing act, was a public fact with notice of which all persons were charged, and that when the bonds were purchased after they had become payable, the purchaser took them subject to all the equitable rights of the State when its relations to the Union had been restored.

But it must be observed that we have not held that such a repealing act was absolutely void, and that the title of the State could in no case be divested. On the contrary, it may be fairly inferred from what was said in *Texas* v. *White*, that if the bonds were issued and used for a lawful purpose, the title passed to the holder unaffected by any claim of the State. Title to the bonds issued to White & Chiles was held not to be divested out of the State, because of the unlawful purpose with which they were issued, and because the holders were, in our opinion, chargeable with notice of the invalidity of their issue and of their unlawful use.

If, in that case, there had been proof that a large portion of the bonds issued without the indorsement of the governor, were in fact issued for legitimate objects, and were applied to legitimate purposes, no presumption could have arisen from the absence of that indorsement that the particular bonds which were the subject of controversy in that case, had been issued without authority and for an unlawful purpose. If, for example, it had appeared that bonds to a

large amount had been issued unindorsed, and applied to the support of schools, or to the maintenance of asylums for the insane, for the deaf mute, or the blind, or to other purposes equally legitimate, the presumption, especially after payment by the United States, would have been in favor of the holders of bonds and not against them. We say especially after payment by the United States, for the United States were the obligors in the bonds, and it was against the United States that the rebellion had been waged, and it was primarily the duty of the government to ascertain and decide whether the bonds had or had not been issued and used in aid of rebellion, and had, therefore, presumptively passed into the hands of holders not entitled to payment as against the reconstituted State of Texas.

The action of the government in refusing payment, during the war, of the coupons of the unindorsed bonds, increased the significance of its action in paying not only the coupons, but the bonds themselves, after the war had terminated. The bonds and coupons could only have been paid on proof, satisfactory to the government, that the title of the State had been divested by its actual authorities for some legitimate purpose, or if otherwise, then to parties not chargeable with notice of the unlawful issue and use. Any other payment would have been a wrong to the reconstituted State.

There was no such proof in either of the cases formerly decided. Whether there was evidence in the present case establishing the fact of unlawful issue and use, and the further fact of notice to the defendants, within the principles heretofore laid down, as now explained and qualified, is for the jury.

We think it unnecessary to examine all the exceptions taken in this case. We shall confine ourselves to the tenth exception taken by the defendants, and to the one taken by the plaintiffs.

We think that the instruction, embodied in this tenth exception, was calculated to mislead the jury. Indeed it could hardly fail to do so. Whether the alienation of the bonds,

by the usurping government, divests the title of the State, depended, as we have said, upon other circumstances than the quality of the government. If the government was in actual control of the State, the validity of its alienation must depend on the object and purpose of it. If that was just in itself and laudable, the alienation was valid; if, on the contrary, the object and purpose were to break up the Union and to overthrow the constitutional government of the Union, the alienation was invalid. So the most that could be said of the absence of the indorsement of the governor, was that it raised a presumption against the validity of the alienation; not that no title to the bonds could be obtained without such indorsement. So, too, it cannot have been correct to say without qualification that the defendants took the bonds, if originally transferred by persons exercising authority in Texas, at war with the United States, subject to all the equities existing against the usurping government. That would depend upon the character and object of the original transfer. And the final proposition of the instruction must be qualified according to these principles, to make it conform to the law as we understand it.

But in our judgment, the instruction given upon the request of the defendants and excepted to by the plaintiff, was quite correct. We are entirely satisfied with it. We think it clear that no one other than a holder of the bonds, or one who, having held them, has received the proceeds, with notice of the illegal transfer for an illegal purpose, can be held liable to the claim of the reconstituted State. After presentment, recognition, and order of payment, any one, never having held or controlled the bonds, may receive the proceeds upon a proper order. In such a case the State must look to the United States, if bonds still belonging to her have been paid to third parties, after presentment and allowance, in favor of holders without good title.

But while we sustain this ruling, the judgment, for erroneous instructions in other respects, must be REVERSED, and the cause must be remanded for further proceeding

IN ACCORDANCE WITH THIS OPINION.