# New Orleans, St. Louis & Chicago Railroad Company vs. The State.

1. CHICKASAW SCHOOL FUND : *Loan to railroad company. Payment during the war in confederate money.*

In 1856, the state having in the treasury a large sum of money known as the Chickasaw school fund, the legislature passed an act of March 7, 1856, authorizing the loan of the same to several railroad companies therein mentioned, for seven years, at 8 per cent. interest. Under the provisions of the said act, the Miss. Cent. R. R. Co. (since consolidated with plaintiffs in error) borrowed, in 1856, 1857, 1859, the aggregate sum of $199,000, and deposited its bonds and certificates of stock as collateral security. December 7, 1863, the legislature authorized the said railroad company and others to pay such indebtedness in gold and silver, or in the treasury notes of this state, and providing that the same, when paid, may be used in payment of any debts and appropriations of the state, in the same manner as other funds belonging to the state are used, provided that the whole amount was paid by the 1st of May thereafter. The Miss. Cent. R. R. Co., by September 26, 1874, paid the full sum of the $199,000, and the state surrendered the bonds and certificates held as security. The legislature in 1865 disregarded the payment so made, and directed suit to be brought for several sums due by the

railroad. *Held,* that the payments made prior to the passage of the act of December 7, 1863, stand upon a different footing from the payments made subsequent to, and in pursuance of, the said act. The validity or invalidity of act or contract while the rebellion existed may be tested by the following grounds: If in aid of the war, they were invalid; if for a legitimate purpose, though by an insurgent or an insurgent body, they are generally valid. The character of the act of December 7, 1863, was determined from its face, contemporaneous legislation and history. See Miss. Cent. R. R. Co. *v.* The State, 46 Miss., 157. It is not possible for the court to say that the payments prior to December 7, 1863, were made for unlawful purposes, or applied to an illegal use. While illegal measures were being supported by state appropriations, yet expenditures were being made for legitimate purposes.

2. SAME: *Payment under act of the legislature of December 7, 1863, in aid of the rebellion.*

The terms of the act, its manifest purposes, contemporaneous legislation and history, are conclusive that it was a war measure, and that the payments made by the railroad subsequent to the act of December 7, 1863, were void.

3. SAME: *Value of confederate money at the time of payment. Case in judgment.*

As to the claim of credit for the value of confederate money at the time of payment, it is not admissible in this case.

APPEAL from the Chancery Court of *Madison* County.

Hon. WILLIAM BRECK, Chancellor.

This is the case formerly before this court, on appeal from the decree overruling a demurrer to the bill, and the decision of which is reported in 46 Miss., 157. The decree overruling the demurrer having been affirmed, an answer was put in which does not vary the case from that presented by the bill, but is an ingenious argument to justify the payments made and prevent recovery by the state. Evidence was taken to show in what currency the payments were made, and that it was out of the power of defendant to produce the securities which had been held by the state, and which were surrendered on receipt of the payments made; and there is an official statement of the amount paid to the Chickasaw counties during the war, on account of interest on the Chickasaw school fund. The Mississippi Central Railroad Company has been merged in the New Orleans, St. Louis & Chicago Railroad Company, in pursuance of law, and prosecutes this appeal from the final decree of the chancery court, made on bill, answer, and evidence. That decree is in favor of the state for the principal

of the debt ($199,000), and interest since 9th January, 1861. The questions are : is the state entitled to a decree ; and, if so, for how much?   The several amounts received by the Miss. Cent. R. R. Co. were as follows, that is to say :

| | | |
|---|---|--:|
| 1856, | March 21 | $45,850.00 |
| | May 7 | 50,000.00 |
| | November 6 | 10,000.00 |
| | December 18 | 27,000.00 |
| 1857, | January 26 | 30,000.00 |
| | January 26 | 10,000.00 |
| | February 28 | 5,000.00 |
| | February 28 | 4,000.00 |
| 1859, | July 5 | 4,150.00 |
| | June 14 | 9,000.00 |
| | November 28 | 4,000.00 |
| | Aggregate | $199,000.00 |

The accruing interest was paid.  The several sums given above became due, each seven years from the respective dates. The payments made were as follows, viz. :

| | | |
|---|---|--:|
| 1863, | February 18 | $45,850.00 |
| | August 19 | 50,000.00 |
| | December 30 | 37,000.00 |
| 1864, | January 29 | 40,000.00 |
| | September 26 | 26,150.00 |
| | Total | $199,000.00 |

Of these payments on account of principal, the first ($45,850) was made *before the debt was due*—seven years not having expired.  At the time of the next three payments (together, $127,000) the sums were due.  Of the last payment $17,150 were not due.  The two first payments ($95,850) were made before the act of December 7, 1863, entitled "An act to enable the railroad companies of this state to pay the moneys borrowed by them."

As the decree is for all that was received by the state after 9th January, 1861, the case distinctly presents the question as

to the legal authority of the government, organized in the territory of Mississippi, and controlling it from and after January 9, 1861, to discharge this claim.

If the doctrine announced in Taylor v. Thomas, 42 Miss., 651, and Miss. Cent. R. R. Co. v. The State, 46 ib., 157, shall be adhered to, the decree must be affirmed, for none of the payments were valid. If a distinction shall be made between payments made before maturity and those made before or after the act of December 7, 1863, a reference to the dates above stated will furnish data for the application of the rule which may be declared. ·

For further facts in the history of this case the reporters refer to the case as reported (46 Miss., 157), and especially for a history of the Chickasaw school fund.

The following is assigned for error :

1. The said court erred in overruling the demurrer to the complainant's bill.

2. The said court erred ·in directing, by its interlocutory order, that interest be calculated on the alleged debt from the 9th day of January, 1861, to the date of said interlocutory decree, and disallowing all payments of principal and interest subsequent to said date.

3. That the said final decree is for a sum greatly in excess of the sum due to the state, as appears by the pleadings and proof.

4. That said final decree is unsupported by proof.

5. The court below, on the whole case made on pleadings and proofs, should have decreed for defendants.

*Harris & George*, for appellants :

Filed an elaborate brief, and argued the case orally, insisting that the payments made by the railroad were valid, and citing and commenting upon the following authorities, to wit : Huntington v. Texas, 16 Wall., 412, 413 ; Guan v. Barry, 15 ib., 623 ; Horne v. Lockhart, 17 ib., 580 ; Buchanan v. Smith et al., 43 Miss., 91 ; Wisler v. McHaw, ib., 269 ; Miller v. Keelher, 9 Wall., 86 ; Acts of the Legislature, 1856, 1863, 1865.

*G. E. Harris*, Attorney General, and *J. A. P. Campbell*, for appellee :

Filed an elaborate written argument, and Judge Campbell argued the case orally, citing and commenting on the following authorities, to show the invalidity of the payments, to wit :    M. & C. R. R. *v*. The State, 46 Miss., 157 ; Acts of 1856, 1863, 1865 ;   Texas *v*. White, 7 Wall., 700 ; Thomas *v*. Richmond, 12 ib., 349 ;   Thomas *v*. Taylor, 42 Miss., 651 ;  Huntington *v*. Texas, 16 Wall., 402 ;  Pagand *v*. The State, 5 S. & M., 491 ; Delmas *v*. Insurance Co., 14 Wall., 661 ;  Zarver *v*. Keech, 15 ib., 67, 209 ;  Luther *v*. Borden, 7 How. (U. S.), 1 ; Horne *v*. Lockhart, 17 Wall., 570 ;  Truely *v*. Lowe et al., 7 S. & M., 325 ;  Wafford *v*. Board Police, 44 Miss., 579 ;  N. O., J. & G. N. R. R. *v*. Mississippi College, 47 ib., 560 ; 2 Story's Eq., §§ 1255, 703, 906 ; Phillips *v*. Hines, 33 Miss., 163 ;  Halleck's Int. L. & L. of War, §§ 449, 805 ; Buck *v*. Vasser, 47 Miss., 551 ; White *v*. Hart, 13 Wall., 646.

TARBELL, J., delivered the opinion of the court.

The Mississippi Central Railroad Company was incorporated by act of the legislature, approved March 10, 1852.    Laws 1852, p. 65.

On March 7, 1856, an act was approved, entitled " An act to provide for the payment of interest on the Chickasaw school fund, and for other purposes."    Laws, 1856, p. 145.

By the provisions of this act ( § 14) it was made the duty of the auditor of public accounts to loan to the several railroads therein named an. amount equal to all moneys in the state treasury arising from the sale or lease of the Chickasaw school lands, to the extent of $400,000.    This loan was directed (§ 15) to be for seven years, at 8 per cent. interest, payable semi-annually.    As security for this loan the auditor was required (§ 16) to take from each company respectively making a loan its first mortgage bonds, equal in amount to the sum loaned, and likewise an amount of scrip, or certificate of capital stock, of such company, in four times the sum loaned.

56

By § 19 of said act it was provided "that should the securities required of the aforesaid companies, or either of them, depreciate in value after the same are deposited in the treasury of the state, so as to be insufficient to secure the amount loaned by either of said companies, then, although the interest on the sum borrowed may be promptly paid by such company, yet it shall be lawful for any succeeding legislature of this state to require of such company additional and sufficient security to render safe the principal borrowed by such company, and upon the failure to provide such additional security, within such time as may be prescribed, the whole debt of such company shall at once become due, and payment of the same may be enforced in the manner prescribed in the preceding section of this act."

The mode of enforcing payment of the moneys loaned under this act was by the sale of the securities, as prescribed in § 18.

Loans under the foregoing act to the Mississippi Central Railroad Company occurred in 1856, 1857, and 1859, aggregating $199,000; its bonds and certificates of stock being deposited in accordance with said act. On December 7, 1863, an act was approved entitled "An act to enable the railroad companies of this state to pay the moneys borrowed by them." Laws, 1863, p. 160. This act authorized the railroad companies to pay into the treasury the sums of money borrowed by them, "provided, that such payment shall be made in gold and silver, or in the treasury notes of this state." (§ 1.) And by § 2 it was provided "that any money paid into the state treasury under the provisions of this act may be used in payment of any debts and appropriations of the state, in the same manner as other funds belonging to the state are used." To § 2 is added a proviso in these words: "Provided, said railroad companies pay the whole amount of this indebtedness to the state on or before the 1st day of May next."

Payments of interest were made in 1856, 1857, 1858, 1859, 1860, 1861, 1862, 1863, and 1864.

And payments of principal were made February 18, 1863, August 19, 1863, December 30, 1863, January 26, 1864, September 26, 1864, amounting in the aggregate to $199.000, the whole sum borrowed of the state.

As these payments were made, the bonds of the company and certificates of stock deposited as security, were surrendered in amounts corresponding with the sums paid.

The constitutional convention of Mississippi, held in 1865, adopted an ordinance, of which section 1 reads as follows: " That all laws and parts of laws enacted by the legislature of the state of Mississippi, since the 9th day of January, 1861, so far as the same are not in conflict with, or repugnant to, the constitution of the United States, and laws made in pursuance thereof, or of the constitution of this state, as it existed on the 1st day of January, 1861, or in aid of the late rebellion, except the laws in relation to crimes and misdemeanors, and except an act entitled ' An act to enable the railroad companies of this state to pay the moneys borrowed by them,' approved December 7, 1863, be, and the same are hereby, ratified and confirmed, and declared to be valid and binding from their respective dates ; and the same shall remain in full force and effect until altered or repealed according to law." Proceedings, etc., p. 39, ch. 7.

The legislature of 1865 (Laws 1865, ch 13, p. 147) enacted as follows :

Section 1. " That in view of the fact that the state of Mississippi, through the auditor of public accounts, did loan to the Mississippi & Tennessee Railroad Company, the Mississippi Central Railroad Company, the Mobile & Ohio Railroad Company, and the New Orleans, Jackson & Great Northern Railroad Company, large sums of money, and the said railroad companies did respectively execute and deliver to the said state, and deposit in the treasury thereof, their obligations to pay, at the expiration of seven ·years from date thereof, the amount so borrowed by said railroad companies respectively, and to pay semi-annually,

4 per cent. interest thereon, and also did execute and file
with said obligations certain other collateral securities, agree-
ably to the provisions of an act approved March 7, 1856;
and in view also of the further fact that the state aforesaid
has lost the possession of the obligations and securities afore-
said, without just and legal compensation for the same, it shall
be, and is hereby made, the duty of his excellency, the governor,.
to make demand of the Mississippi & Tennessee Railroad
Company, the Mississippi Central Railroad Company, and the
Mobile & Ohio Railroad Company, for new bonds or obligations
and new securities, such as shall, in his opinion, be amply suffi-
cient to secure the semi-annual payment of the interest, and
the ultimate payment of the sums of money which were due
and owing to the state of Mississippi on the 1st of January,
1863, on account of money by them respectively borrowed, in
pursuance of the provisions of said act; said new bonds or
obligations, intended to secure the ultimate payment of the
principal debt, may be so varied in form from those originally
given by said railroad companies as to make the same due and
payable in different installments, or otherwise, at such time or
times, not to extend beyond the period of twenty years from
the passage of this act, as the governor, in his discretion, may
agree upon with said railroad companies; the interest on said
original fund shall be due and payable on the first days of
January and July of each year, until the original debt be
finally paid; provided, all such new bonds or obligations, when
so given, shall be deposited in the treasury of the state, and
shall have the same legal effect and be as binding upon said
railroad companies, respectively, as the originals were when
given."

Section 2. "That it shall be, and is hereby made, the duty
of the attorney general of this state, on being so directed by
the governor, to institute suit or suits against the Mississippi
& Tennessee Railroad Company, the Mississippi Central Rail-
road Company, and the Mobile & Ohio Railroad Company, or
either of them that may or shall fail or refuse to make, exe-

cute, and deliver to the governor, upon his demand, the new bonds or obligations, and other securities, as provided for in this act, within six months from and after demand made for the same, as hereinafter provided for ; and the attorney general shall, in virtue of his office aforesaid, without further fee or reward from the state other than his annual salary, prosecute all such cases to final judgment."

As directed by the act last cited, the attorney general filed the bill in this case in 1869.   Upon the various grounds growing out of the war, and which are too familiar to be repeated, it is claimed that the payments subsequent to the act of secession were illegal and void.   The prayer of the bill is that an account be taken, to ascertain the amount due the state on account of principal and interest of the several sums of money borrowed by the railroad company on account of the Chickasaw school fund ; that in taking such account the commissioner be instructed to disregard the several payments made by the railroad company, and that those payments be declared null and void ; that the railroad company be decreed to pay such sum as might be found due on such accounting ; that the company be directed to deliver the obligations and collaterals (originally deposited as securities upon making the loan, and surrendered to the company when payments were made) to some person, to be designated by the court, to hold pending this litigation ; that these securities be delivered to the state ; that respondent set forth a list or schedule and description of every deed, book, account, letter, paper, or writing relating to the matters in litigation, or either of them, or wherein or whereupon there is any note, memorandum, or writing, relating in any manner thereto, which are, or ever were, in the possession, power, or control of respondent, and for an account of such as are not in the possession or control of respondent, and for general relief, etc.

To this bill there was a demurrer, which was overruled. The cause was then taken to the supreme court, where it was argued at great length by counsel, and fully considered by the

court, as will be seen by reference to the report· of the case. Miss. Cent. R. R. Co. v. The State, 46 Miss., 157.

. When the case was remanded an answer was filed, and proof taken as to loans and payments, their sums and dates.   From the decree of the chancellor—in accordance with the prayer of the bill, holding all payments of principal and interest made subsequent to January 9, 1861, to be void, and decreeing payment of the whole sum loaned, with interest at 8 per cent., deducting only payments prior to the last date named—an appeal was prayed, and the cause is again in this court.

. Errors are assigned as follows :   In overruling the demurrer to the bill ; in directing interest to be calculated on the whole debt from January 9, 1861 ; in disallowing all payments of principal and interest subsequent to last date ; the decreeing a sum greatly in excess of the amount due ; in rendering a decree· unsupported by· the proof ; in rendering final decree for complainant ; in not rendering a decree for respondent.

Payments having been made in this case both before and after the law of December 7, 1863, the issue herein is not alone as to the effect of that statute, but as to payments prior thereto.   The broad proposition is presented as to the legal authority of the government organized in the territory of Mississippi, and controlling it, from and after January 9, 1861, to discharge the claim involved.   Among other averments of the bill are these :   That the payments specified were without authority of law ; that those payments were to an insurrectionary and revolutionary government ; that such government had no right or authority to receive said payments ; that therefore said payments were null and void ; that said payments were freely and voluntarily made ; that said payments rendered aid, assistance, and encouragement to the enemies of the United States ; that said payments were made in notes, purporting to be money, issued by the insurrectionary and revolutionary government controlling the state of Mississippi, and by another insurrectionary and revolutionary government known as the "Confederate States ;" that said notes were issued for the.

purpose of aiding and assisting said insurrectionary and revolutionary governments in their resistance to the lawful authority of the United States, and could not form a valid consideration for a contract, wherefore said payments were void; that said insurrectionary and revolutionary government obtained said securities, and the same were given up to said government, illegally, wrongfully, and fraudulently, etc.

The answer admits and states the loan, the deposit of the securities, and the payments; denies that the bonds and stock certificates were lost, or fraudulently or illegally obtained by a surrender to respondents; avers that payments were made in strict accordance with the law of March, 1856, and without any purpose to aid secession or rebellion, or to aid or strengthen any unlawful resistance to the constitution or laws of the United States, or to the authority of the government thereof, or to aid the enemies thereof; nor were such payments made with any knowledge or belief on the part of respondent that the sums so paid would be so employed, and they deny that such payments were received to be so employed, or that they were in fact so employed; avers that the payments were made in the currency common in the country, and by which all values were tested; that respondents received this currency after it passed into general circulation; that this currency was not all issued in aid of the war, but much of it was to supply the necessities of business and other legitimate objects; and respondents deny that these payments were made in currency issued in aid of the rebellion; deny that they received or paid this currency for unlawful purposes, but in compensation for transportation of passengers and freight; aver that the stock certificates, on being returned to the company, were canceled, and the bonds have been transferred to *bona fide* holders for value, the holders and owners being unknown to respondents, nor have they any means of identifying such bonds. Respondents admit the act of secession, but aver that it was illegal and void, and deny that the local state government was destroyed, or that the people were

deprived of the inherent right of self-government; whereupon respondents insist that the payment of the debt involved, being accepted in good faith by the existing state government, and paid in good faith, was a discharge of said debt, or, in any event, is a discharge to the extent of the value of the currency in which it was paid; but, should this be denied, it is insisted that to the extent that the state used the money, as principal or interest, in defraying its ordinary expenses in administering the local affairs of the state, and in paying its just debts, and not to promote resistance to the government of the United States, such payments should be allowed.   The answer further submits that the ordinance of the convention of 1865, legalizing certain legislative acts since January 9, 1861, in excepting the act of December 7, 1863, and the act of November 21, 1865, directing the governor to disregard said act of 1863, are in conflict with the constitution of the United States, wherein it is declared that no state shall pass any law impairing the obligation of contracts.

It is believed that the positions assumed by the railroad company, in answer to this claim of the state, are substantially embodied in the following propositions of counsel:

1. The loan was of money of the state, and from its treasury, and was made by the state under statutes the legality of which no one questions.

2. The company complied with the conditions of the acts which authorized the loan and declared the terms on which it was made.

3. These acts were never suspended or repealed, but continued in full force after the act of secession, and constrained the payments at the time of such payments.

4. The principal and interest were fully paid to the officer authorized by the law to receive the same, under authority of statutes enacted by the government of Mississippi, which was an actual, existing government, with right to pass such statutes and power to enforce all the demands of the state, and was the successor of the government which had controlled the state

since 1833, and not the creature of violence or usurpation, and was lawfully so in possession of that power.

5. Said government was a government *de facto*, and by the law had right to pass the acts involved and receive payment of the debt, in doing which it violated no duty it owed to the United States, and its action in that respect was not impaired by its refusal to recognize its relations and duties to the United States, but was valid.

6. Said payments were not in fact made with intent to aid insurrection and rebellion, and were made under the constraint of the laws actually in force, and in the presence of power which could not be resisted, and upon such payments the state voluntarily returned the obligations and securities it had received.

7. The case is that of an executed contract, voluntarily made and completed on the terms proposed by the state, the conditions of which were fully complied with ; and it does not lie in the power of the state to repudiate such settlement and payment, and no principle of justice or public law warrants the demand now made.

For many reasons the views of the Supreme Court of the United States, upon the question presented by the case at bar, are entitled to especial consideration.    And, besides, as the cases in that court are cited and commented upon by counsel on both sides, a somewhat full analysis of at least two of those adjudications is deemed essential.    The facts in Texas *v.* White, are briefly these :  Texas held the bonds of the United States to the amount of $5,000,000, bearing date January 1, 1851, and were all made payable to the state of Texas, or bearer, and redeemable after December 31, 1864.    These bonds, for $1,000 each, were received in behalf of the state by the comptroller of public accounts, under authority of an act of the legislature, which, besides giving that authority, provided that no bond should be available in the hands of any holder until after indorsement by the governor of the state.    After the breaking out of the rebellion the insurgent legislature of

Texas, on January 11, 1862, repealed the act requiring the indorsement of the governor, and on the same day provided for the organization of a military board, composed of the governor, comptroller, and treasurer, and authorized a majority of that board to provide for the defense of the state by means of any bonds in the treasury, upon any account, to the extent of $1,000,000. The defense contemplated by the act was to be made against the United States, by war. Under this authority the military board entered into an agreement with White & Childs for the sale of 135 of these bonds, then in the treasury of the state, and seventy-six more, then deposited in England, in payment for which they engaged to deliver to the board a large quantity of cotton cards and medicines.

This agreement was made January 12, 1865. On March 12, 1865, White & Childs received from the military board 135 of these bonds, none of which were indorsed by any governor of Texas.

After declaring the perpetuity and indissolubility of the Union, and that Texas continued to be a state, and a state of the Union, notwithstanding the transactions referred to, the court say : " It is by no means a logical conclusion, from the premises which we have endeavored to establish, that the governmental *relations* of Texas to the Union remain unaltered. Obligations often remain unimpaired, while *relations* are greatly changed. The obligations of allegiance to the state and of obedience to the laws, subject to the constitution of the United States, are binding upon all citizens, whether faithful or unfaithful to them, but the *relations* which exist while those obligations are performed are essentially different from those which arise when they are disregarded and set at naught. And the same must necessarily be true of the obligations and relations of states and citizens to the Union.  *  *  *  All admit that during this condition of civil war the rights of the state as a member, and of her people as citizens, of the Union, were suspended. The government and the citizens of the state, refusing to recognize their constitutional obligations,

assumed the character of enemies, and incurred the conse-quences of rebellion." Discussing the question, whether or not the title of the state to the bonds was divested, it is said: "That the bonds were the property of the state of Texas on the 11th of January, 1862, when the act prohibiting alienation, without the indorsement of the governor was repealed, admits of no question, and is not denied. * * * In this case, however, it is said that the restriction imposed by the act of 1851 was repealed by the act of 1862. And this is true if the act of 1862 can be regarded as valid. But was it valid?" The answer to this question furnished the key for the solution of problems theretofore esteemed impossible of satisfactory settlement. The court say: "The legislature of Texas, at the time of the repeal, constituted one of the departments of a state government, established in hostility to the constitution of the United States. It cannot be regarded, therefore, in the courts of the United States, as a lawful legislature, or its acts as lawful acts. And yet it is an historical fact that the government of Texas, then in full control of the state, was its only actual government; and certainly if Texas had been a separate state, and not one of the United States, the new government—having displaced the regular authority, and having established itself in the customary seats of power, and in the exercise of the ordinary functions of administration—would have constituted, in the strictest sense of the words, a *de facto* government, and its acts, during the period of its existence as such, would be effectual, and in almost all respects valid. And to some extent this is true of the actual government of Texas, though unlawful and revolutionary as to the United States." The court proceeds thus: "It is not necessary to attempt any exact definitions within which the acts of such a state government must be treated as valid or invalid. It may be said, perhaps, with sufficient accuracy, that acts necessary to peace and good order among citizens—such, for example, as acts sanctioning and protecting marriage and the domestic relations, governing the course of descents, regulating the

·conveyance and transfer of property, real and personal, and providing remedies for injuries to person and estate, and other similar acts, which would be valid if emanating from a lawful government—must be regarded in general as valid when proceeding from an actual, though unlawful, government; and that acts in furtherance or support of rebellion against the United States, or intended to defeat the just rights of citizens, and other acts of like nature, must in general be regarded as invalid and void.''

This question is then asked : '' What, then, tried by these general tests, was the character of the contract of the military board with White & Childs?'' The answer is thus given : '' That board, as we have seen, was organized, not for the defense of the state against a foreign invasion, or for protection against domestic violence, within the meaning of these words as used in the national constitution, but for the purpose, under the name of defense, of levying war against the United States. This purpose was undoubtedly unlawful, for the acts which it contemplated are, within the express definition of the constitution, treasonable.'' It appears, in the record of that case, that the military board was reorganized subsequent to its creation, and with extended powers, as to which the court say : '' It was insisted, in argument on behalf of some of the defendants, that the contract with White & Childs, being for the purchase of cotton cards and medicines, was not a contract in aid of the rebellion, but for obtaining goods capable of a use entirely legitimate and innocent, and, therefore, that payment for those goods by the transfer of any property of the state was not unlawful. We cannot adopt this view. Without entering at this time upon the inquiry whether any contract made by such board can be sustained, we are obliged to say that the enlarged powers of the board appear to us to have been conferred in furtherance of its main purpose—of war against the United States—and that the contract under consideration, even if made in execution of these enlarged powers, was still a contract in aid of the rebellion, and therefore void.

And we cannot shut our eyes to the evidence, which proves that the act of repeal was intended to aid rebellion by facilitating the transfer of these bonds.   It was supposed, doubtless, that negotiation of them would be less difficult if they bore upon their face indirect evidence of having come from the possession of any insurgent state government.   We can give no effect, therefore, to this repealing act."   It being urged in behalf of certain other of the defendants in that case that, "however unlawful may have been the means by which White & Childs obtained possession of the bonds, they are innocent holders without notice, and entitled to protection as such, under the rules which apply to securities which pass by delivery"— referring to Murray v. Lardner (2 Wall., 118)—the court add: "We held in that case that the purchaser of coupon bonds, before due, without notice and in good faith, is unaffected by want of title in the seller, and that the burden of proof in respect to notice and want of good faith is on the claimant of the bonds as against the purchaser.   We are entirely satisfied with this doctrine."

The court then propounds this question:  "Does the state, then, show affirmatively notice to these defendants of want of title to the bonds in White & Childs?"   In response the court say: "It would be difficult to give a negative answer to this question, if there were no other proof than the legislative acts of Texas."

The facts in Huntington v. Texas (16 Wall., 402) are these: The state of Texas brought suit against Huntington, cashier of the First National Bank of Washington, for the alleged conversion of thirty-seven of 5,000 bonds of $1,000 each, originally issued to the state in 1851, being a portion of the same issue and description of bonds involved in Texas v. White. Huntington advanced money on these bonds, with a general, but not specific, knowledge of some objection to their payment. He made occasional inquiries, at the proper department in Washington, with reference to the redemption of these bonds, but the details of the facts are not material.   If not of the lot

sold to White & Childs, they were of the same description, and disposed of under the law of Texas of 1862. On the trial of that case, in compliance with a request of the plaintiffs, the court below instructed the jury " that the government of Texas, from August, 1861, to July, 1865, was a usurping government, incapable of performing any act which could legally divest the title to property of the state, and that, if the jury should find that the bonds in question were alienated by that government or its agents, such alienation passed no title; also, that the defendants could acquire no title to the bonds without the indorsement of them by a governor of Texas, loyal to the United States; also, that, if the defendants took the bonds after maturity, they took them subject to the right of property in them of the state of Texas; and, finally, that if the bonds were transferred after maturity, by persons exercising authority in Texas and at war with the United States, then, no matter how or from whom received by the defendants, they were still the property of the plaintiffs, and that the act of defendant in procuring payment of them from the United States treasury, if that was done, was a conversion, and made defendants liable for their value with interest."

In accordance with this instruction the jury found for the plaintiffs.

The chief justice, delivering the opinion of the court, said:

" We have held, in Texas v. White and Texas v. Hardenberg, 1st. That when a state, by public statute, requires the indorsement of its governor as a prerequisite to the valid transfer of bonds belonging to it, and payable to itself or bearer, the holder of such bonds, without such indorsement, will have no title as against the state, unless he can show the consent of the state otherwise given to the transfer. 2d. That an act repealing the statute requiring the indorsement of the governor, passed by the legislature when the state is in rebellion against the United States, is a nullity as to bonds issued without such indorsement and for the purpose of aiding the rebellion. 3d. That such bonds remain the property of the state, and may

be reclaimed, or the proceeds thereof recovered, in a proper action by that state, when there bellion has ceased, against any one in possession of the same with notice of the intent with which they were issued and used. 4th. That the existence of the rebellion at the time of the repealing act was a public fact, with notice of which all persons were charged, and when the bonds were purchased after they had become payable, the purchaser took them subject to all the equitable rights of the state when its relations to the Union had been restored.

But it must be observed that we have not held that such a repealing act was absolutely void, and that the title of the state could in no case be divested. On the contrary, it may be fairly inferred from what was said in Texas v. White that, if the bonds were issued and used for a lawful purpose, the title passed to the holder, unaffected by any claim of the state. Title to the bonds issued to White & Childs were held not to be divested out of the state, because of the unlawful purpose with which they were issued, and because the holders were in our opinion chargeable with notice of the invalidity of their issue and of their unlawful use.

*If in that case there had been proof that a large portion of the bonds issued without the indorsement of the governor were in fact issued for legitimate objects, and were applied to legitimate purposes, no presumption could have arisen, from the absence of that indorsement, that the particular bonds which were the subject of controversy in that case had been issued without authority and for an unlawful purpose. If, for example, it had appeared that bonds to a large amount had been issued unindorsed and applied to the support of schools, or to the maintenance of asylums for the insane, for the deaf, mute, or the blind, or to other purposes equally legitimate, the presumption, especially after the payment by the United States, would have been in favor of the holders of bonds, and not against them.* * * * There was no such proof in either of the cases formerly decided. Whether there was evidence in the present case establishing the fact of unlawful issue and use, and the further fact of notice to the

defendants, within the principles heretofore laid down, as now explained and qualified, is for the jury."

With reference to instructions before quoted the court say: "We think that the instruction embodied in this 10th exception was calculated to mislead the jury. Indeed it could hardly fail to do so.

"*Whether the alienation of the bonds by the usurping government divests the title of the state depended, as we have said, more upon the circumstances than the quality of the government. If the government was in actual control of the state, the validity of its alienation must depend on the object and purpose of it. If that was just in itself, and laudable, the alienation was valid; if, on the contrary, the object and purpose were to break up the Union, and to overthrow the constitutional government of the Union, the alienation was invalid.* So the most that could be said of the absence of the indorsement of the governor was, that it raised a presumption against the validity of the alienation—not that no title to the bonds could be obtained without such indorsement. So, too, it cannot have been correct to say, without qualification, that the defendants took the bonds—if originally transferred by persons exercising authority in Texas, at war with the United States—subject to all the equities existing against the usurping government. That would depend upon the character and object of the original transfer. And the final proposition of the instruction must be qualified according to these principles, to make it conform to the law as we understand it."

Bearing in mind the facts in the two cases just cited, and the views of the court thereon, the striking similarity between those cases and the one at bar, as affected by the act of December 7, 1863, is most manifest, while the payments prior to the passage of that act seem to stand upon an entirely different footing.

The arguments of counsel are greatly devoted to a discussion of the statutes, power, and rights of the state, or state legislation during hostilities. The cases cited clearly adjust the

grounds of testing the validity or invalidity of an act or contract while the rebellion existed. If in aid of the war, they were invalid. If for a legitimate purpose, though by an insurgent body, they are generally held to be valid.

There is little difficulty, in the case at bar, as to payments under the act of December 7, 1863. The question propounded by the court, in its opinion in Texas v. White, as to the defendants other than White & Childs, was this : " Does the state, then, show affirmatively notice to these defendants of want of title to the bonds in White & Chiles ?" To which the answer was : " It would be difficult to give a negative to this question if there were no other proof than the legislative acts of Texas." So in the case at bar, when before this court on demurrer to the bill. The result then reached was based upon the character and object of the act of December 7, 1863. Miss. Cent. R. R. Co. v. The State, 46 Miss., 157. The character of that act was determined from its face, contemporaneous legislation, and history.

But how is it as to payments prior to the act of December 7, 1863? In view of the denials and averments of the pleadings, it is impossible to declare that such payments were made for an unlawful purpose, or that they were applied to an illegal use. Is this difficulty aided by the legislation or history of the period? That active hostilities were in progress is but too well known to all.

At the same time that there were illegal measures, there were the usual appropriations and expenditures for legitimate objects. To the extent that these payments were employed for the support of the civil establishment, it seems to be clear the railroad company should have credit.

In the nature of things it is probably beyond the power of the courts and of evidence to determine the proportion of the good and bad uses to which this money was applied.

Nor upon principle is the argument so conclusive in support of the illegality of these payments (prior to 1863) as to command universal approval. On the contrary, the tendency of

57

the later adjudications is to cast serious doubts upon this branch of the case.

It is averred in the answer that these payments of principal and interest were made in good faith, under the law of 1856, and as the company was in receipt of funds from freight and passengers.

Is it sufficient and satisfactory to rest the illegality of these payments upon the fact of the war? We are not prepared, at this time, so to declare.

In our own courts Thomas v. Taylor, 42 Miss., 651, is referred to. The facts afford its own simple solution. Taylor, in 1866, was the owner of a number of bales of cotton, on which there was due to the state of Mississippi a tax of $2 per bale, by virtue of an act entitled "An act laying a special tax upon certain persons and property," approved November 16, 1865. In May, 1866, he tendered to the tax collector, in payment of said tax, a treasury note of the state of Mississippi, commonly called a "cotton note," issued by virtue of an act entitled "An act authorizing the issuance of treasury notes as advances upon cotton," approved December 19, 1861. This act authorized the issue of $5,000,000 of the notes, and they were receivable for all taxes except the military tax. The act of November 16, 1865, levying the special tax on cotton, required the collector of taxes to collect the same in the currency of the United States. That these notes were issued, not merely to furnish a currency to the people, but as a war measure, would seem to be too palpable for doubt. See contemporary legislation: Acts approved November 29, 1861, December 20, 1861, January 29, 1862 (Pamphlet Acts, p. 244), January 29, 1862 (Pamphlet Acts, p. 286).

As understood, the judgment in the above case of Thomas v. Taylor was affirmed by the Supreme Court of the United States, on the ground that the treasury notes involved were bills of credit, and void because prohibited by the constitution of the United States.

The chancery judge, in his opinion in Miss. Cent. R. R. Co.

*v.* The State, 46 Miss., 219, says : "In the case of Thomas *v.* Taylor, 42 Miss., 710, the high court of errors and appeals of this state has decided that these treasury notes, being issued in aid of the late civil war, are illegal and void."

As before stated, the collector of taxes was forbidden to receive the cotton money in payment thereof. Laws of 1865, p. 190 ; § 15 of Act approved November 16, 1865.

Referring to the pleadings, to the adjudications cited herein, to the obstacles in the way of proving to what extent, if any, the payments involved prior to December 7, 1863, were used for illegal purposes, to the probable impossibility of proving the bad faith of the railroad company in its payments prior to the date named, and to the tendency of its late decisions, it is concluded, without extended discussion, and in view of the very clear enunciations quoted, that the illegality of the payments prior to December 7, 1863, cannot be placed on any satisfactory grounds, but as to the payments subsequent thereto, that they should be held void. The terms of that act, its manifest purpose, contemporary legislation and history, are conclusive that it was a war measure.

The militia of the state—including the entire white population, temporary as well as permanent residents, between the ages of seventeen and fifty years—was placed on a war footing December 9, 1863. See acts approved November 26, and December 1, 1863, chapters 2, 3, 4, with reference to the collection of taxes. An act to better provide for the families of soldiers, approved December 2, 1863, appropriated $500,000 for that purpose. An act to compensate soldiers in the state service, in certain cases, was approved December 3, 1863. An act to empower the governor to impress slaves and other personal property, for the public service, was approved December 1, 1863. An act authorizing the state treasurer to receive from delinquent tax collectors the military bonds or notes falling due June 1, 1863 and 1864, was approved December 9, 1863. On the same day was approved an act to provide for the payment of claims of deceased soldiers ; appropriations

for the relief of families of soldiers in several counties; an act to provide cotton and wool cards for indigent families of soldiers and citizens of the state; an act for the relief of the Mississippi state troops captured at Vicksburg; an act appropriating $25,000 to pay the first battalion of Mississippi state troops; an act providing for the payment of certain informal claims against the state, appropriating $2,400,000 for the military service, and a joint resolution asking the confederate congress to pass a law regulating the currency and legal tender. On December 31, 1863, an act was approved providing shoes and clothing for the soldiers of the state, either in the state or confederate service. On the 5th of the same month was approved "An act authorizing the governor to issue interest-bearing bonds, for the purpose of calling in and taking up the treasury notes issued for military purposes." On the same day the 3 per cent. fund was placed in the treasury for the payment of general warrants. With other unimportant exceptions, the entire legislation of November and December, 1863, was framed with a view to the continuation of war. Even the local laws of that session were in the main conferring upon the counties some power in aid of the war. The total appropriations and expenditures of the state that year are estimated at the enormous sum of $9,000,000.

The following quotation from one of the opinions read in this case when it was formerly before us is regarded as appropriate in this connection: "It must be assumed, as a truth which enforces itself upon the understanding, that there must have been some extraordinary motive that induced the legislature of 1863 to invite the railroad companies to pay into the treasury this large indebtedness (loaned in coin, or its equivalent) in a currency then depreciated 400, 500, or 600 per cent. below coin standard. It was not called in for reinvestment, for these companies held it upon ample security. The cheap funds in which the payment might be made was a stimulant to the debtors to comply with the law; that they should do so speedily. They would be cut off from the oppor-

tunity altogether unless they complied within four months. Contemporaneous history is expressed in the public events of the times, and, written in coeval legislation, furnishes a conclu-sive explanation.

" The territory of the state was then a part of the theater of war ; vast hostile armies were upon or within her frontiers, and the legislature were putting into requisition every energy and recourse to meet the crisis.    A considerable force of state troops had been put in the field.    There was a necessity for large sums of money to meet the necessary and pressing expenditures.    In looking over the legislation of 1863, a short time before and after the passage of the law under considera-tion, it will be seen that it was chiefly directed to measures of military defense, to maintain troops in the field, and the families of soldiers at home.

" On the 9th of December, 1863, an act was passed appro-priating $2,400,000 for the support of troops, outfit, etc., for the ensuing fiscal year.    On the same day $25,000 was voted to aid in equipping a cavalry regiment.    On the same day $100,000 were placed at the disposal of the governor for the purchase of cotton and woolen cards for the families (prima-rily) of soldiers.    On the 3d of the same month payment was directed to be made out of the treasury for cavalry horses lost in the service.    On the 5th of the same month the 3 per cent. fund (also a trust fund) then in the treasury, or that might afterwards come in, was placed subject to general warrants. The space of six days embraces these acts of the legislature " (and many others might have been added), " and also the act to authorize the railroad companies to pay their indebtedness to the state.

" Those extraordinary demands for, and appropriations of, money could not be met by the income from the taxes ; besides these, were the expenses of the civil establishments of the state.    Therefore the indebtedness of the railroad com-panies to the state was called in.    Therefore, also, the 3 per

cent. fund was liberated from its trust character.   Money is. an indispensable sinew of war."

The arguments of counsel are both able and learned, as well as instructive.   The aim of this review is not to pursue the discussion through all the varied theories and principles which it suggests, but so to simplify the facts as to conduct to a. certain conclusion, in accordance with accepted and what are generally esteemed wise rules applicable thereto.   These rules seem to be clearly defined in the cases cited.

As to the claim of credit for the value of confederate currency at the time of payment, it is, on reflection, not entitled to favorable action.   It is not admissible in this case.

Decree reversed and decree here for complainant, for principal and interest of money loaned, deducting payments of principal and interest prior to December 7, 1863.